MILK MARKETING BOARD v. JOHNSON.
JOHNSON v. MILK MARKETING BOARD.

1. CONSTITUTIONAL LAW—DELEGATION OF LEGISLATIVE POWER TO ADMINISTRATIVE OFFICERS.

    The legislature, within limits defined by law, may confer authority on an administrative officer or board to make rules as to details, to find facts, and to exercise some discretion in the administration of a statute.

2. SAME—MILK MARKETING LAW—DELEGATION OF POWERS.

    The milk marketing law sets up sufficiently definite standards for the guidance of the board charged with its administration and does not make an unconstitutional delegation of legislative power (Act No. 146, Pub. Acts 1939).

3. STATUTES—TITLE—PURPOSE OF ACT.

    The title to an enactment is required to be expressive of the purpose and scope of the enactment and if it comes fairly within and is reasonably a component part of the purpose

expressed, the provision is not an interloper but a part of the enactment and so proper as to be expected therein (Const. 1908, art. 5, § 21).

4. Same—Title of Act—Constitutional Law.

Under the constitutional provision relative to the title of a legislative act, a title is good if it fairly indicates the general subject matter covered by the act but the title need not be sufficient in detail to constitute a table of contents or an index to the various provisions of the act (Const. 1908, art. 5, § 21).

5. Same—Milk Marketing Law—Title.

The milk marketing law entitled, "An act relative to the production and distribution of milk; to create a milk marketing board, and define its powers and duties; to provide for the licensing of milk dealers; to prescribe penalties for the violation of the provisions of this act; and to declare the effect of this act," is sufficiently comprehensive to indicate a provision for an assessment on milk production (Const. 1908, art. 5, § 21; Act No. 146, Pub. Acts 1939).

6. Food—Milk—Check-Off for Benefit of Local Marketing Committee.

Reasonable check-off, permitted by milk marketing law upon payments by distributors to producers of milk, to be paid local milk marketing committee for its necessary expenses in functioning under the act, does not constitute a tax, nor make the act a revenue measure, as the provision is merely incident to regulation of the industry and proper under the police power of the State (Act No. 146, § 24, subd. [b], Pub. Acts 1939).

7. Same—Milk—Minimum Prices—Notice of Hearing.

Notice by publication in a newspaper in general circulation throughout milk marketing area of at least one week before date set for hearing by milk marketing board for setting minimum prices to be paid producers by distributors in the area *held,* sufficient notice (Act No. 146, § 19, Pub. Acts 1939).

8. Same—Milk Marketing Board—Review by Supreme Court.

Provision of milk marketing law that findings of fact made by the milk marketing board, acting within its powers, shall, in the absence of fraud, be conclusive, but that the Supreme Court shall have power to review questions of law by certi-

orari, mandamus, or by other methods of review, did not constitute an unconstitutional limitation on the right of review (Act No. 146, § 53, subd. [g], Pub. Acts 1939).

9. CONSTITUTIONAL LAW—COURT REVIEW OF ACTS OF AGENCIES CREATED BY LEGISLATURE.

Legislative attempts to make findings of fact of its agencies conclusive, even though the findings are wrong and constitutional rights are invaded, would be invalid, as the judicial power of the courts cannot thus be circumscribed.

10. FOOD—HEARINGS—MILK MARKETING BOARD—LIMITATION ON SCOPE OF REVIEW BY SUPREME COURT.

Statutory limitation on scope of review by Supreme Court of orders of the milk marketing board necessarily calls for a fair hearing before the board (Act No. 146, § 53, subd. [g], Pub. Acts 1939).

11. CONSTITUTIONAL LAW—DUE PROCESS—MILK MARKETING BOARD—HEARING.

Although the milk marketing board performs a function legislative in nature, it may act only after a fair hearing in which the requirements of due process are satisfied.

12. FOOD—MILK MARKETING BOARD—IMPARTIAL PERSONNEL.

Milk marketing law creating milk marketing board consisting of the commissioner of agriculture, two producers of milk, one distributor and one consumer was fatally defective in failing to provide for administration of the law by a body which is impartial in its composition (Act No. 146, § 5, Pub. Acts 1940).

13. SAME—DISTRIBUTION OF MILK—PRICE-FIXING—IMPARTIAL REGULATION.

Distributor of milk whose methods of doing business were somewhat different from those of his competitors is entitled to a fair and impartial hearing by a regulatory body whose membership does not have a pecuniary interest in the matter of fixing prices and regulation of the business (Act No. 146, Pub. Acts 1939).

NORTH and McALLISTER, JJ., dissenting.

Appeal from Wayne; Toms (Robert M.), J. Submitted June 18, 1940. (Docket No. 2, Calendar No. 41,090.) Decided December 10, 1940.

Bill by Michigan Milk Marketing Board against George A. Johnson to enforce plaintiff's order No. 2, as amended, relative to minimum prices fixed by it to be paid producers of milk by the distributors thereof in the Detroit milk marketing area. Decree for plaintiff. Defendant appeals. Reversed.

Appeals from Michigan Milk Marketing Board. Submitted June 18, 1940. (Docket Nos. 1, 3, Calendar Nos. 41,059, 41,156.) Decided December 10, 1940.

After public hearings as to prices at which milk could be sold or purchased by producers, distributors, or consumers in the Detroit milk marketing area, the Michigan Milk Marketing Board issued its orders Nos. 3 and 4 relative to minimum prices at which milk could be sold to the consumer. George A. Johnson, distributor, reviews such orders by appeal in the nature of certiorari. Orders vacated.

*Harold Goodman* and *Hoffius & Van Kovering,* for appellant.

*Thomas Read,* Attorney General, and *Edmund E. Shepherd* and *Robert L. Arnold,* Assistants Attorney General (*Donald I. Albaugh,* of counsel), for appellee.

*David E. McLaughlin* and *Carl H. Smith, amici curiae.*

BUSHNELL, C. J.   Plaintiff Johnson was granted a writ of certiorari to review Orders 3 and 4 of the Michigan milk marketing board, which determined the existence of an emergency and fixed wholesale and retail prices of milk within the Detroit milk marketing area.

After the entry of order No. 3, the board filed a bill of complaint in Wayne circuit seeking to restrain Johnson and his agents from violating amended order No. 2. During the hearing on the chancery matter, Johnson agreed to submit to the licensing provisions of the milk marketing act, Act No. 146, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 5394-41 *et seq.*, Stat. Ann. 1940 Cum. Supp. § 12.805 [1] *et seq.*), and that question is eliminated from the case.

For a number of years, many of the milk producers in Michigan have been organized as the Michigan Milk Producers Association, with market sales committees in various counties. This association has current and invested assets of over $200,000, and trust assets of $135,000. The trust assets are to guarantee payments to producers and provide for a quarantine fund, et cetera. The amount of milk sold in the Detroit marketing area is about 2,000,000 pounds daily, some 80 per cent. of which is supplied by members of the association. Formerly, the association was financed by dues from its members. Under the act, the board authorized a check-off of four cents per hundredweight on milk handled in the area, which is used in part to finance the association.

Johnson is the fourth largest milk distributor in the Detroit area. He purchases milk from producers and distributes at retail through a chain of milk depots on a cash and carry plan. He claims to be able to pay more for milk, sell it for substantially less than others, and still make a profit. However, he ignores the factors of base and surplus and does not carry his share of the burden of this claimed necessary element of cost of milk.

After the publication of notice and informal hearings without the swearing of witnesses, certain orders were issued by the board. Order No. 1, made

July 17, 1939, designated the extent of the Detroit milk marketing area. Order No. 2, entered August 8, 1939, is quite inclusive and regulatory. Its main purpose is to establish minimum prices to be paid producers by distributors. The minimum price on Class 1 milk was established at $1.90 per hundredweight. This order was amended in considerable detail on August 28th, the minimum on Class 1 being fixed at $2.08.

Following publication of notice and hearings at which all witnesses were sworn, order No. 3 was entered on September 29, 1939. This order fixed in detail the minimum prices at which milk of various grades could be sold to the consumer, setting the retail price of 3½ to 4 per cent. milk from vehicles at 11 cents per quart in containers, and from retail stores at 9 cents. Other prices were fixed for varying grades and quantities.

Order No. 4, dated March 27, 1940, amended order No. 3 in certain respects, without changing the differential of 2 cents between the price of milk sold from stores and that retailed through wagon deliveries.

The trial judge filed a comprehensive opinion in the chancery cause, denied Johnson's claim of unconstitutionality of the act, and authorized a decree granting the relief prayed for in plaintiff's bill of complaint.

The constitutional objections raised by Johnson in the chancery cause were summarized by the trial judge as follows:

"(1)   The Michigan milk marketing board (hereafter referred to as the board) is prohibited by reason of the personal interest of its members in its orders and regulations from acting lawfully.

"(2)   The check-off provisions of the statute (section 24, subd. [b]) violate the due process of law

provisions of the Federal and State constitutions, and the price-fixing orders based thereon constitute a fraud against producers and distributors.

"(3) The notice of hearing provided by section 19 is so inadequate, both as to content and time, as to amount to a violation of the due process of law provision.

"(4) The limitation upon judicial review pre- scribed in section 53 violates the due process of law provisions of the Constitution.

"(5) The delegation of the power to fix price of milk by the use of base and surplus plan consti- tutes an unlawful delegation of legislative power."

These objections are renewed on appeal, with enough change to conform to the joint review of the orders, by certiorari, and of the decree, by appeal. It is also claimed that the title of the act is insuffi- cient. Appellant urges that we should declare the statute unconstitutional and, if such determination is not available, that orders Nos. 2, 3, and 4, as amended, should be held invalid.

Milk marketing acts have been considered by several courts of last resort. The acts of Connecti- cut, Maryland, New Hampshire, and Utah have been declared unconstitutional, and the acts of Alabama, California, Florida, Georgia, Indiana, Iowa, New Jersey, New York, Oregon, Pennsylvania, Virginia, and Wisconsin have been held good. The authorities may be found collected in 101 A. L. R. 64, 110 A. L. R. 644, 119 A. L. R. 243, and 122 A. L. R. 1062. The more recently decided cases are *Savage* v. *Martin,* 161 Ore. 660 (91 Pac. [2d] 273) ; *Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal. (2d) 620 (91 Pac. [2d] 577) ; *Rowell* v. *State Board of Agriculture,* 98 Utah, 353 (99 Pac. [2d] 1) ; and *State* v. *Stoddard,* 126 Conn. 623 (13 Atl. [2d] 586).

The leading case is *Nebbia* v. *New York,* 291 U. S. 502 (54 Sup. Ct. 505, 89 A. L. R. 1469), an appeal

from *People* v. *Nebbia*, 262 N. Y. 259 (186 N. E. 694). It is the basis on which various milk marketing acts have been held constitutional. We refrain from repeating what Mr. Justice Roberts there said regarding the importance of an adequate supply of milk and the need for regulation of prices so as to insure a continous flow to the congested centers of population.

Although determination of the constitutionality of our act will be made upon the single question of the composition of the board as tested by the principle of due process, we deem it advisable to discuss other phases in the event that reenactment is sought.

Is the act constitutional and did the board comply with it in issuing its orders?

The argument is advanced that the legislature could not delegate its authority to fix prices. Where this same argument was made in other States a complete answer was found in the *Nebbia Case*. Within proper limits, legislative power may be delegated, as was the power of altering and fixing rates for public service corporations in *City of Traverse City* v. *Railroad Commission*, 202 Mich. 575 (P. U. R. 1918 F, 752). See, also, *Argo Oil Corporation* v. *Atwood*, 274 Mich. 47; *Smith* v. *Wayne County Sheriff*, 278 Mich. 91; and *Warnshuis* v. *State Board of Registration in Medicine*, 285 Mich. 699. As stated in the *Argo Oil Case*:

"It is too well settled to need the citation of supporting authorities that the legislature, within limits defined in the law, may confer authority on an administrative officer or board to make rules as to details, to find facts, and to exercise some discretion, in the administration of a statute. The difficulty is in determining whether the limits are sufficiently defined to avoid delegation of legislative powers. Exhaustive annotations of the general subject will

be found in 12 A. L. R. 1435; 54 A. L. R. 1104; 92 A. L. R. 400.''

The act under consideration sets up sufficiently definite standards for the guidance of the board. In this respect, it can be distinguished from the Connecticut and New Hampshire acts, discussed in *State v. Stoddard, supra,* decided May 1, 1940.

The title of the act reads:

''An act relative to the production and distribution of milk; to create a milk marketing board, and define its powers and duties; to provide for the licensing of milk dealers; to prescribe penalties for the violation of the provisions of this act; and to declare the effect of this act.''

Appellant contends that this title is inadequate because it fails to indicate the provision for an assessment upon milk production. The court has spoken many times on this subject, the general rule being recently stated:

''The title to an enactment is required to be expressive of the purpose and scope of the enactment. If the enactment comes fairly within and is reasonably a component part of the purpose expressed in the title it is not an interloper but a part thereof and so proper as to be expected therein.'' *In re Lewis' Estate,* 287 Mich. 179, 183.

In *City of Bay City* v. *State Board of Tax Administration,* 292 Mich. 241, 249, the court said:

''In numerous decisions of this court it has been held in substance that the title to an act is good if it fairly indicates the general subject matter covered by the act; and that the constitutional provision (Const. 1908, art. 5, § 21) does not require a title sufficient in detail to constitute a table of contents or an index to the various provisions of the act.''.

The title to the act is sufficient.

Section 24, subd. (b), permits a check-off to be used for the necessary expenses of local milk marketing committees, et cetera. The board is given power to administer the funds so collected. The statute requires this check-off to be reasonable and limits the expenditures to the purposes of the act. The check-off provision was questioned in *Reynolds* v. *Milk Commission*, 163 Va. 957 (179 S. E. 507). We agree with the holding of that court that such assessment is not the levying of a tax, nor is the act a revenue measure. The provision is merely incident to regulation of the industry and is proper under the police power of the State.

Question is raised as to lack of notice of hearings. Section 19 requires publication in a newspaper or newspapers in general circulation through the marketing area at least a week before the date set for hearing, and this is sufficient notice.

It is argued that Section 53 imposes limitations upon judicial review. This section provides in part:

"(g) The findings of fact made by said board acting within its powers shall, in the absence of fraud, be conclusive, but the Supreme Court shall have power to review questions of law involved in any final decision or determination of said board."

Then follows a provision for application by the aggrieved party within 30 days by certiorari, mandamus, et cetera. This is almost identical with section 12 of part 3 of the workmen's compensation law (2 Comp. Laws 1929, § 8451 [Stat. Ann. § 17.186]). In *Hughson* v. *City of Kalamazoo*, 271 Mich. 36, 40, the court said:

"Though the proceedings before the department of labor and industry are not strictly judicial

\* \* \* they may be attacked only in the manner provided by law.''

Such limitation upon review is in keeping with the accepted law of this State and provides ample redress to the aggrieved party. We have always held, under the workmen's compensation law, that the court will examine the record to determine whether there is any evidence to sustain the findings of fact made by the department of labor and industry. As was said in *Highland Farms Dairy* v. *Agnew*, 16 Fed. Supp. 575, 585, affirmed 300 U. S. 608 (57 Sup. Ct. 548):

"It is true that if a legislature attempts to make the findings of fact of its agencies conclusive, even though the findings are wrong and constitutional rights have been invaded, the legislative action is invalid, for the judicial power of the courts cannot thus be circumscribed.''

See authorities therein cited. The court said further in construing the Virginia milk statute:

"But the statute under consideration does not attempt to circumscribe the powers of a court, and it is not invalid simply because it does not provide for access to the courts. Such access always exists if there is any arbitrary action on the part of the legislature or of a legislative agency which deprives a citizen of his constitutional rights.''

See *Weimer* v. *Bunbury*, 30 Mich. 201.

We are urged to hold that the board did not comply with the act in issuing its orders. Decision is unnecessary on this point, but, as a matter of guidance, it might be well to point out that the Pennsylvania act contains a provision for hearings similar to that found in the Michigan act. In construing this act, the court said, in *Colteryahn Sanitary Dairy* v.

*Milk Control Commission,* 332 Pa. 15, 20 (1 Atl. [2d] 775, 122 A. L. R. 1049):

"It is the general intent and purpose of the act that in the promulgation, revision or change of official orders fixing prices, a definite record should be made of all evidence produced before the commission, and all matters upon which it bases its orders. The production of proof before this administrative body is not subject to the strict rules of evidence and the commission may make its independent survey of the milk industry in the particular area to acquire a just and fair understanding of the problem before it. But the result of that survey should be placed on the record of the hearing before the commission, and the parties who made the survey should be subject to such cross-examination as is proper. Interested parties should be accorded opportunity to test the reliability of the commission's evidence before an order is promulgated, revised or changed."

The statutory limitation upon judicial review necessarily calls for a fair hearing before the board. Such is the implication of the following in *St. Joseph Stockyards Co.* v. *United States,* 298 U. S. 38, 51 (56 Sup. Ct. 720):

"When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily."

Although the milk marketing board performs a function legislative in nature, it may act only after a fair hearing in which the requirements of due process are satisfied. *

---

* See Const. 1908, art. 2, § 16.—Reporter.

The chief difficulty with the present act is in the composition of the board. Section 5 reads:

"There is hereby created a milk marketing board to consist of 5 members as follows: The commissioner of agriculture shall be a member and chairman of the board by virtue of his office and 4 other members to be appointed by the governor, by and with the advice and consent of the senate, as follows: 2 shall be milk producers not connected with the distribution of milk except by a bona fide producer cooperative marketing association, both of whom shall have as their principal occupation and earn their principal livelihood by the actual management of 1 or more dairy herds; 1 shall be a distributor, and 1 shall be a consumer not connected with the production or distribution of milk. The members of the board, other than the commissioner of agriculture, shall hold office for a term of 3 years: Provided, That a member shall hold office until his successor is appointed and qualified. A vacancy in any class of membership of the board, excepting the chairman, shall be filled within 30 days by appointment from the same class for the unexpired term by the governor. The governor may remove any member after due notice and hearing, for misfeasance, malfeasance, or nonfeasance in office. Each member of the board, except the commissioner of agriculture, shall receive for services actually rendered pursuant to this act not to exceed $10 per day plus actual and necessary expenses: Provided, That not more than $3,000 plus actual and necessary expenses, shall be paid to any member during any year."

The board as set up consists of E. A. Beamer, commissioner of agriculture, who is also a producer of milk; T. H. Lukins, a member of the Kalamazoo Milk Producers Association; Fred W. Meyer, who is president of the Michigan Milk Producers Association; Charles L. Wilson, a distributor and a mem-

ber of the firm of Ira Wilson & Sons Dairy Company, Inc., the third largest distributing concern in the area; and Mrs. C. L. Barber, a consumer.

No claim is made that any member of the present board has acted unfairly or arbitrarily, but the fact remains that the act requires the appointment of a board, a majority of whose members have a direct pecuniary interest in the matters submitted to them. Several States have provided for boards of like nature but examination of the authorities discloses that no question has been raised as to the composition of such boards.

In order that the administration of the milk industry may be conducted in a fair and impartial manner, it is essential that the board be impartial in its composition. The act is fatally defective in its provision for the appointment of the personnel of the board. We quote from *Carter* v. *Carter Coal Co., 298 U. S. 238, 310 (56 Sup. Ct. 855), where the court, in discussing subdivision (g) of part 3 of section 4 of the bituminous coal conservation act of 1935 (49 Stat. 1002), said:

"That subdivision delegates the power to fix maximum hours of labor to a part of the producers and the miners—namely, 'the producers of more than two-thirds of the annual national tonnage production for the preceding calendar year' and 'more than one-half of the mine workers employed;' and to producers of more than two-thirds of the district annual tonnage during the preceding calendar year and a majority of the miners, there is delegated the power to fix minimum wages for the district or group of districts. The effect, in respect of wages and hours, is to subject the dissentient minority, either of producers or miners or both, to the will of the stated majority, since, by refusing to submit, the minority at once incurs the hazard of enforcement of the drastic compulsory provisions of

the act to which we have referred. To 'accept,' in these circumstances, is not to exercise a choice, but to surrender to force.

"The power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be, and often are, adverse to the interests of others in the same business. The record shows that the conditions of competition differ among the various localities. In some, coal dealers compete among themselves. In other localities, they also compete with the mechanical production of electrical energy and of natural gas. Some coal producers favor the code; others oppose it; and the record clearly indicates that this diversity of view arises from their conflicting and even antagonistic interests. The difference between producing coal and regulating its production is, of course, fundamental. The former is a private activity; the latter is necessarily a governmental function, since, in the very nature of things, one person may not be entrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. The delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question. *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 537 (55 Sup. Ct. 837, 87 A. L. R. 947); *Eubank* v. *Richmond,* 226 U. S. 137, 143 (33 Sup. Ct. 76, 42 L. R. A. [N. S.] 1123, Ann. Cas. 1914 B, 192); *Washington, ex rel. Seattle Title Trust Co.,* v. *Roberge,* 278 U. S. 116, 121, 122 (49 Sup. Ct. 50, 86 A. L. R. 654)."

After decision in the *Carter Coal Company Case,* *supra,* Congress repealed the bituminous coal conservation act of 1935, and enacted the bituminous coal act of 1937 in its place. This act (50 Stat. at L. 72, chap. 127 [15 USCA, § 828]) sought to remedy the objections raised in the *Carter* opinion by creating a disinterested commission. Among the provisions of the new act is the following:

"Two members of the commission shall have been experienced bituminous coal mine workers, two shall have had previous experience as producers, but none of the members shall have any financial interest, direct or indirect, in the mining, transportation, or sale of, or manufacture of equipment for, coal (whether or not bituminous coal), oil, or gas, or in the generation, transmission, or sale of hydroelectric power, or in the manufacture of equipment for the use thereof, and shall not actively engage in any other business, vocation, or employment." 15 USCA, § 829(a).

The act of 1937 was upheld in *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 399 (60 Sup. Ct. 907). The court, in discussing the question of delegation of legislative power, recited the standards set up by Congress under which the commission might fix maximum prices, and, after approving these, said:

"Nor has Congress delegated its legislative authority to the industry. The members of the code function subordinately to the commission. It, not the code authorities, determines the prices. And it has authority and surveillance over the activities of these authorities. Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid." *Currin* v. *Wallace,* 306 U. S. 1 (59 Sup. Ct. 379); and cases cited.

In *Currin* v. *Wallace,* 306 U. S. 1, 15 (59 Sup. Ct. 379), where the tobacco inspection act of 1935 (49

Stat. at L. 731, chap. 623 [7 USCA, § 511 *et seq.*]) was held valid, the court said:

"This is not a case where a group of producers may make the law and force it upon a minority (see *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 310, 318 [56 Sup. Ct. 855]), or where a prohibition of an inoffensive and legitimate use of property is imposed not by the legislature but by other property owners (see *Washington, ex rel. Seattle Title Trust Co.,* v. *Roberge,* 278 U. S. 116, 122 [49 Sup. Ct. 50, 86 A. L. R. 654]). Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application."

Johnson is the fourth largest distributor of milk in the Detroit area. His methods of doing business are somewhat different from those of his competitors. He is entitled to a fair and impartial hearing before the fixing of prices and regulation of his business. While the prices fixed by the board apply to all producers and distributors, the effect of the price scale is not the same upon all producers or all distributors.

No one should act as a judge in his own cause. The board, as constituted under the statute, is of such a nature that Johnson was not, and could not have been, accorded that impartial hearing which satisfies the requirements of due process. Section 5 of the act violates both the spirit and letter of the Constitution (Const. 1908, art. 2, § 16). The orders promulgated by a board so composed are invalid and void.

The decree appealed from is reversed and plaintiff's bill of complaint is dismissed. All orders of the board are vacated. Costs to appellant in both cases.

SHARPE, CHANDLER, WIEST, and BUTZEL, JJ., concurred with BUSHNELL, C. J.

McAllister, J. (*dissenting*). I am of the opinion that the decree of the circuit court should be affirmed. The proceedings of the board, which are before us for review, are legislative in their nature. The powers conferred upon the board are of a general character, affecting the production and distribution of milk as an industry, and in the exercise of such powers the board acts in the capacity of a rate-making body. See *City of Madison* v. *Madison Gas & Electric Co.*, 129 Wis. 249 (108 N. W. 65, 8 L. R. A. [N. S.] 529, 116 Am. St. Rep. 944, 9 Ann. Cas. 819). "The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind." *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 226 (29 Sup. Ct. 67).

Any interest of the members of the board in the result of the rules, regulations, and orders promulgated by them does not render the act unconstitutional. In matters affecting legislative or administrative acts, the law only requires that the officers engaged in such administration act from disinterested motives. Where the State regulates businesses or professions, the administrative bodies generally are composed of members of the businesses or professions to be so regulated, in keeping with a legislative policy of entrusting such regulation to those best equipped, through knowledge and experience, for the task. Practically all of the States in which the production of milk is a major industry have enacted statutes similar to that of Michigan, providing that the members of the board be appointed from those engaged as producers and distributors and from consumers. In *Highland Farms Dairy, Inc.*, v. *Agnew*, 300 U. S. 608 (57 Sup. Ct. 549), a statute of Virginia, creating a milk commission, was held to be valid, and the power of

regulation was held to be lawful although it was provided by the act that the commission consist of three members, two of whom were required to be producers of milk. Apparently no question was raised with regard to the membership of the commission. In *Franklin* v. *State, ex rel. Alabama State Milk Control Board*, 232 Ala. 637 (169 South. 295), the court upheld the validity of a milk control board which had power to fix prices. In that case, the board was required to be composed of one wholesale producer, one producer-distributor, one distributor, one consumer, and one member not engaged in the milk industry. No question was raised with regard to the requirements of the personnel of the board. I cannot subscribe to the proposition that, because certain members of the board, in the instant case, are required to be milk producers, a nonproducer or distributor is thereby deprived of the right to a fair hearing in proceedings to regulate the milk industry, on the ground that the interest of such a distributor is outnumbered by the interest of producers upon the board. The interest of a farmer member of the board in such proceedings must be considered as the interest of agriculture in general. It cannot be whittled down to a controversy between a farmer and a distributor. And I cannot agree that the representation of the interest of agriculture on a milk marketing board must be held to result in an unfair and prejudiced composition of such an administrative body.

Courts are not concerned with the wisdom of legislation. It is not every injudicious, unwise, or unfair law that is unconstitutional. To be so held, a law must contravene the provisions of the Constitution. It is said in the accompanying opinion that no one should act as a judge in his own cause,

and thereby it is sought to bring the act in question under the prohibition of the due-process clause of the Constitution. But the proceedings here reviewed are not judicial proceedings; they are only general orders of the board, with which the defendant has refused to comply. Even the question of granting of a license is not here involved, inasmuch as the defendant never applied for such a license. The attack is upon the provisions of the act, which applied to all producers and distributors alike. In view of the fact that the only complaint with which we are concerned is with regard to the legislative proceedings of the board, it cannot be maintained that defendant has been denied due process.

I see no difficulty in distinguishing the instant case from *Carter* v. *Carter Coal Co.,* 298 U. S. 238 (56 Sup. Ct. 855). In that case, a statute provided for the delegation of the power to fix maximum hours of labor and production to a certain percentage of producers and workers. In the case before us, the power to make regulations and orders is not delegated to a percentage of producers and distributors, but to a board.

The members of the milk marketing board are public officials appointed by the governor pursuant to an act of the legislature.

"There is always a presumption that official acts or duties have been properly performed, and in general it is to be presumed that everything done by an officer in connection with the performance of an official act in the line of his duty was legally done, whether prior to the act, such as giving notice, *or determining the existence of conditions prescribed as a prerequisite to legal action,* or subsequent to such act. * * *

"As the proper performance of official duties requires that the official shall act in good faith, such good faith is presumed. * * *

"And unless the presumption of regularity is rebutted, it is conclusive." 22 C. J. pp. 130, 135, 136.

Doubtlessly, it was with this rule in mind that Mr. Justice Sutherland, in *Carter* v. *Carter Coal Co.,* *supra* (p. 311), drew the distinction between delegation to public officials composing a commission and delegation to private interests, when he said, with reference to the statute providing that a certain proportion of those engaged in the coal industry be empowered to fix minimum wages and maximum hours of labor: "This is legislative delegation in its most obnoxious form; for it is not even delegation *to an official or an official body, presumptively disinterested,* but to private persons whose interests may be and often are adverse to the interests of others in the same business."

It is presumed that members of an official public commission act in good faith.

Appellant cites, in support of his argument, the rule laid down in Cooley's Constitutional Limitations (3d Ed.), p. 410, wherein it is said: "No one ought to be a judge in his own cause," and in the accompanying opinion this rule is cited as the basis upon which the act is held unconstitutional. But, in the work cited, the above quotation from the eminent authority on constitutional law is preceded by the following sentence which limits its application:

"There is also a maxim of law regarding *judicial action* which may have an important bearing upon the constitutional validity of *judgments* in some cases."

When, as said in the opinion of the Chief Justice, "the milk marketing board performs a function

legislative in nature,'' I am unable to see why the decision, based on constitutional grounds, with regard to the action of the board, should be governed by the rule applicable to *judicial action* and the validity of *judgments*. The purpose of the board, and its action now before us for review, was the promulgation of regulations for the milk industry. This was a legislative function. The action of the board was not the trial of an individual citizen. It did not partake of the nature of a judicial function. Its orders were not judgments. It is said that the board is ''of such a nature that Johnson was not, and could not have been, accorded that impartial hearing which satisfies the requirements of due process.'' It seems to me that this is to confuse the meaning of the word ''hearing,'' and to imply that it is in the nature of a trial. The hearing was for the purpose of securing facts and information for the guidance of the board in promulgating regulations. It was for the benefit of the board, and not for the benefit of Johnson, who was not entitled to be accorded an impartial hearing in the sense of being given an impartial trial; for the proceeding was not a trial, and defendant's individual rights were not before the board for determination.

To adopt the opinion of the Chief Justice in this case clearly commits this court to applying the same qualifications to members of an administrative commission in making regulations as is required of judges in trying cases; and, further, to apply the same rules to proceedings in making administrative orders as govern proceedings in the trial of a cause before a judge and the entering of decrees and judgments. No authority can be found to sustain such an extreme view in matters of administrative law, and it would seem to result in a confusion between the rules governing the exercise of judicial power

and those governing the exercise of legislative power. The fact that the statute provides that the board appointed by the governor is to consist of two milk producers, one distributor, one consumer and the commissioner of agriculture does not result in unconstitutional delegation of legislative power.

In *Miami Laundry Co.* v. *Florida Dry Cleaning and Laundry Board,* 134 Fla. 1, 46, 52 (183 South. 759, 780, 119 A. L. R. 956), the only case in point that has come to our attention, a statute provided for the regulation of the cleaning and laundry industry and delegated such regulation and control to a board of seven members to be appointed by the governor and to consist of three members from the laundry industry, three members from the cleaning industry, and one member from the general public. In holding that such delegation of legislative power was not unconstitutional, and that the statutory requirements as to the qualifications of the members of the board were not in violation of the due process clause, the court (on rehearing) said:

"Unless the Constitution is violated, statutory regulations control as to the classes and qualifications of those from whom members of a board shall be appointed to administer a law regulating the performance of 'services of a public nature.' It is not shown that the statutory provision as to the classes or qualifications of those from whom the board in this case must be chosen violates any express specific provision of the Constitution or that such statutory provision so operates as to deprive any person of a property right without due process of law, or denies to any person the equal protection of the laws, in violation of sections 1 and 12 of the Declaration of Rights of the State Constitution or of the Fourteenth Amendment to the Federal Constitution. See opinion on rehearing in *State, ex rel.*

*Lichtenstein,* v. *Coleman,* 134 Fla. 129 (183 South. 730), filed at this term.

"There is no unlawful delegation of legislative power in authorizing an administrative board to make rules and regulations for the execution of statutory provisions. *Railroad Com'rs* v. *Railroad Co.,* 24 Fla. 417 (5 South. 129, 2 L. R. A. 504, 12 Am. St. Rep. 220) ; *State* v. *Railroad Co.,* 56 Fla. 617 (47 South. 969, 32 L. R. A. [N. S.] 639).

"The reasonableness of the charges fixed for service is not involved here. ·

"While it does seem to be incongruous that six of the seven members of the board to administer the law are to be appointed from among those who are engaged in performing the 'services of a public nature' that are regulated, it is not shown that the board so constituted does or will in fact operate to deny to any person due process or equal protection of the laws in excessive charges or unjust discrimination or their abuses of governmental authority.''

We are here concerned with the question of the regulation of the milk industry. Since the case of *Nebbia* v. *New York,* 291 U. S. 502 (54 Sup. Ct. 505, 89 A. L. R. 1469), no doubt exists that it is subject to such regulation. Who knows more about the problems attendant upon the production of milk than dairy farmers? They represent a large and important element of agriculture in this State. Upon the amount of money received by them for their production depends the well-being, prosperity, and even solvency of the dairy farmer—and, in many cases, the prosperity and solvency of a large proportion of those engaged generally in agriculture, as, often, dairy farming is carried on as a part of general agriculture. This, in turn, affects the general welfare in many particulars.

Would it be more conducive to the proper regulation of the dairy business of farmers to exclude such

producers from appointment by the governor to a State milk marketing board? Or may the board be composed entirely of producers, just so long as the statute does not specify such a designation of membership? Such a condition would seem to ignore a realistic disposition of the problem, under the compulsion of a ritual, not justified by constitutional inhibitions; and while the point is not pressed by appellant, it must be considered in passing upon the question before us. Or is such a commission only to be constituted of farmers who do not carry on the dairy business, or who have retired from business; or of agricultural college professors who are not engaged in the business; or of those who have no knowledge whatever of its problems? Such a view is contrary to the legislative policy manifested in laws under which members of commissions regulating businesses and professions are made up of persons engaged in such businesses or professions. Because two members of the board are appointed from among producers, and only one member from among distributors, does such circumstance deprive distributors of due process of law? Where producers of milk in the State outnumber distributors by perhaps 500 to 1, is the legislature to be held to give equal representation to the two groups in the membership of the board? To me, it would seem that all of these questions are matters of policy and judgment, encompassed by the legislative power, and with which courts have no concern.

The power of regulation delegated to the board is constitutional. The power exercised by the board in the promulgation of regulations was legislative in nature. The constitution of the membership of the board did not deny defendant due process of law.

In the disposition of the other issues raised on appeal, I concur in the opinion of the Chief Justice.

The orders of the milk marketing board should be sustained, and the decree of the circuit court should be affirmed, with costs to plaintiff.

North, J., concurred with McAllister, J. The late Justice Potter took no part in this decision.