**SOUTHEAST MILK SALES ASSOCIATION, INCORPORATED, Plaintiff,**

**v.**

**O. A. SWARINGEN, Chairman, and Wm. M. Buck, J. Everette Flora, Wade M. Hobson, Charles L. McLawhorn, Mrs. F. A. Needham, A. W. Nesbitt, Donald L. Paul, and James A. Graham, as and constituting the North Carolina Milk Commission, and the North Carolina Milk Commission, an instrumentality of the State of North Carolina, Defendants.**

**No. C–192–G–65.**

United States District Court
M. D. North Carolina,
Greensboro Division.

Sept. 16, 1968.

Welch Jordan, of Jordan, Wright & Nichols, Caffrey & Hill, Robert F. Moseley, of Moseley & Edwards, Greensboro, N. C., D. Paul Alagia, of Brown & Alagia, Louisville, Ky., George M. Warren, Bristol, Va., and T. J. O'Toole, Washington, D. C., for plaintiff.

Hubert Humphrey, of McLendon, Brim, Brooks, Pierce & Daniels, Greensboro, N. C., and W. C. Harris, Jr., and Charles A. Poe, Holding, Harris, Poe & Cheshire, Raleigh, N. C., for defendants.

Before CRAVEN, Circuit Judge, and STANLEY and GORDON, District Judges.

GORDON, District Judge.

Plaintiff, Southeast Milk Sales Association, Incorporated (Southeast) seeks the issuance of a permanent injunction enjoining the defendant, North Carolina Milk Commission[1] (Commission), its members, officers, and agents, and all others acting in active concert with them, from applying or enforcing or attempting to apply or enforce as to Southeast and its members Sections IV–A–1, IV–B–2, IV–C–1, IV–C–2, IV–E–1A, V–C–2, and V–C–4 of Milk Marketing Order No. Two (Order No. Two). Southeast contends that these provisions, as applied to it and its members, constitute a burden on interstate commerce, conflict with federal regulation of interstate commerce as provided in the Capper-Volstead Act, 7 U.S.C. § 291, deny Southeast and its members equal protection of the law and due process of law and impair the obligations of contract. Provisions of the United States Constitution contended to be violated by some or all of the aforementioned provisions of Order No. Two are: Article I, Section 8, Clause 3; Article I, Section 10, Clause 1; Article VI, Clause 2, and Amendment XIV, Section 1 of the Constitution of the United States.

In addition, Southeast seeks to have declared unconstitutional Section 266.7 of Article 28B, Chapter 106 of the General Statutes of North Carolina. It is contended that this Section violates the due process clause of the Constitution of the United States.

Because this action tests the constitutionality of a state statute and requests injunctive relief, a three judge court was assembled pursuant to 28 U.S.C. §§ 2282 and 2284.

The documents constituting the record were stipulated to by counsel, and the case was heard on stipulations, briefs, and oral argument. The Court commends counsel for the plaintiff and defendants for their cooperation with each other and with the Court in stipulating to facts not in dispute, and for the very helpful extracts of material of special pertinency. Appreciation is expressed to counsel for their efforts to assist the Court in focusing attention on the crucial facts and law in the case.

For the reasons herein set out, we deny the relief requested by the plaintiff.

*Southeast*

Southeast is an agricultural marketing cooperative association of milk producers, incorporated and organized under the laws of the Commonwealth of Virginia, qualified to do business in the State of North Carolina, with its principal office and place of business located in Bristol, Virginia. The Secretary of Agriculture of the United States has determined that

---

1. Article 28B, Chapter 106, of the General Statutes of North Carolina, often referred to as the North Carolina Milk Commission Law, enacted in 1953, created the North Carolina Milk Commission. Under the powers given the Commission by the Statute, Milk Marketing Order No. Two was promulgated.

Southeast is a qualified cooperative association under the provisions of an Act of Congress of February 18, 1922, as amended, known as the Capper-Volstead Act, 7 U.S.C. § 291. Such cooperatives handle the sale of the milk of its members and generally look after the total marketing program for its members.

Organized as a non-stock, non-profit, tax-exempt corporation, Southeast has members instead of stockholders. It has two "divisions," Appalachian and Piedmont. The Appalachian Division Office is in Bristol, Virginia, and the Piedmont Division Office is in Greensboro, North Carolina. To the Appalachian Division are attached members residing in Kentucky, Tennessee, Virginia, West Virginia, and North Carolina, and to the Piedmont Division are attached members residing in Virginia, North Carolina, and South Carolina. In the Piedmont Division, the members of Southeast deliver their milk to distributors licensed under the North Carolina Milk Commission Law, and in November, 1966, Southeast had approximately 252 members in its Piedmont Division.

Southeast and all its members have executed documents entitled "Membership Marketing Agreements." [2] Southeast has not marketed the milk of any of its members in North Carolina who hold a "base" with a distributor licensed under Order No. Two.

Southeast is not a licensed distributor [3] under the North Carolina Milk Commission Law, has not applied for a distributor's license under the North Carolina Milk Commission Law, and has never been advised by the Commission that it is subject to the provisions of the Milk Commission Law.

2. Among other provisions, the Membership Marketing Agreement of Southeast provides:
"2. The member hereby appoints the Association his agent for the purpose of marketing all milk produced by him for market, and will consign and deliver to the Association, or its order, all such milk for the duration of this agreement, except such as is retained for farm family use; and the member hereby agrees that the Association shall have full power and authority to mingle the milk of the member with the milk of any and all other members.
\*    \*    \*    \*    \*
"10. Inasmuch as it is now and ever will be extremely difficult to determine the actual damage to the Association and the other members, should the Member fail to deliver all of his milk as herein provided, the Member agrees to pay the Association five cents (5¢) per gallon of milk delivered, consigned, marketed, sold, or withheld by or from him other than in accordance with the terms of this agreement as liquidated damages, all parties agreeing that this agreement is one of a series dependent for its true value upon the adherence of each and all the members to each and all of the said agreements, but it is mutually agreed that the cancellation of any such agreements, or the failure of any member to comply therewith, shall not affect this agreement."

3. The General Statutes of North Carolina, Article 28B, Chapter 106, § 266.6 defines "Distributor" as follows:
" 'Distributor' means any of the following persons engaged in the business of distributing, marketing, or in any manner handling fluid milk, in whole or in part, in fluid form for consumption in the State of North Carolina, but shall not mean any distributor who sells twenty-five (25) gallons or less of milk per day which is produced on his own farm:
"(1) Persons, irrespective of whether any such person is a producer:
a. Who pasteurize or bottle milk or process milk into fluid milk;
b. Who sell and/or market fluid milk at wholesale or retail:
1. To hotels, restaurants, stores or other establishments for consumption on the premises,
2. To stores or other establishments for resale, or
3. To consumers;
c. Who operate stores or other establishments for the sale of fluid milk at retail for consumption off the premises.
(2) Persons wherever located or operating, whether within or without the State of North Carolina, who purchase, market or handle milk for resale as fluid milk in the State."

*North Carolina Milk Commission*

The North Carolina Milk Commission Law was enacted in 1953. Pursuant thereto the Commission was appointed in 1953, and regulations known as Milk Marketing Order No. One were promulgated. Effective September 25, 1963, Milk Marketing Order No. One was superceded by Milk Marketing Order No. Two, and certain of the regulations of Order No. Two are the focal point of this controversy.

The Commission staff examines the monthly reports of milk and cream receipts, sales and utilizations of each licensed distributor each month and prepares a summary of receipts, sales, and usage, and verifies on occasions the figures, computations, and classifications shown on the monthly reports of receipts and utilizations submitted by the milk distributors. Approximately seven staff members of the Commission are engaged in auditing the reports of the distributors and make periodic visits to the plants of the distributors.

Essentially, Order No. Two regulates the price that a distributor must pay a producer for his milk. Under its provision the producers are paid for their milk by the distributors in accordance with its ultimate utilization by the distributor. No distributor or producer has brought an action or proceeding of any kind either before the Commission or in Court attacking the provisions of Milk Marketing Order No. Two.

Licensed distributors under the North Carolina regulations acquire milk from producers located out of the State of North Carolina and producers in North Carolina sell milk to distributors located outside of North Carolina. There are approximately 200 producers living in other states who regularly sell and deliver milk to North Carolina licensed distributors and are a part of the distributor pools, and are paid under the same regulations as producers who live in North Carolina. Approximately 2,722 producers deliver milk to approximately 35 licensed distributors under Order No. Two. Under the North Carolina regulations and as the regulations are applied, the location or residence of the producer has not been a factor determining the right of a producer to sell and deliver milk to distributors licensed under the regulations. There is no evidence of any instances in which the regulations have been applied to exclude out of state milk.

As of November, 1966, Southeast had approximately 252 members living in its Piedmont Division, principally in North Carolina but some in Virginia and South Carolina, who sold and delivered their milk to distributors licensed by the Commission. However, hundreds of producers located in North Carolina sell and deliver milk to purchasers who are not licensed and regulated by the Commission.

As the provisions of Order No. Two are applied, a distributor pool is not determined by state lines or boundaries, but rather is made up of producers located conveniently near the distributor so as to economically and practically effect delivery of milk. Understandably, by reason of the perishable nature of milk, distributors generally depend on a local supply of milk for regular needs.

*Milk Classification under Milk Marketing Order No. Two*

Sections IV–A [4] and IV–E [5] of Order Number Two define the milk products

---

4. Section IV–A provides:

    A. *Milk Classification*
    The following minimum classification shall apply to all distributors in each marketing area as defined in this order. However, any distributor may classify products in a higher class than the class designated for such products in this section.

1. Class I shall include all milk and/or milk products sold or disposed of for consumption or use as follows:
All fluid milk, including pasteurized, homogenized, raw, whole lactic milk, cream buttermilk, chocolate or other flavored milks or drinks, dietary modified milk, fluid cream, egg nog, sour

5. See note 5 on page 297.

included in the respective classifications and provide for a minimum producer price for each classification. The classification is according to the use made of

cream, sour cream dips, milk-cream mixtures, sterile milk, and concentrated milk. Products containing butterfat of six per cent (6%) or more shall be computed on a milk equivalent basis. All fluid milk, fluid milk products, fluid cream, milk-cream mixtures (including products sweetened or flavored) sold, or disposed of for consumption or use, under any trade name (regardless of grade) shall be classified as Class I except such milk products classified as Class II.

1A. Class IA shall include:

All bulk milk or cream sold to other distributors or transferred between branches or plants of the same company for fluid use as defined in paragraphs A–1 and A–2 of this Section including transfers for military usage for which a different producer price may apply. Also, Class IA shall include the sales of milk made directly to military installations for which a producer price different from the Class I price may apply.

2. Class II shall include:

All skimmed milk, skim milk with added solids, fortified Grade A skimmed milk, cultured skim and/or plain buttermilk, containing less than one per cent (1%) butterfat, sold or disposed of for consumption or use and not accounted for in the milk equivalent of Class I cream and/or milk-cream mixtures. Also, milk shake mix may be included as Class II based upon the actual weight of the product less any allowable deductions as specified in Section IV–D, paragraph 3. (No deduction for the skim equivalent of cream sales may be deducted from milk shake mix.)

(Skimmed milk, skim milk with added solids, fortified Grade A skimmed milk, cultured skim and/or plain buttermilk, containing more than one per cent (1%) butterfat, shall be classified as Class I.)

3. Class III may include:

All milk received and not accounted for in Class I, Class IA or Class II, subject to complete and accurate records being maintained by the distributor which will account for the disposition and use of all milk received including shrinkage or loss.

5. Section IV–E in pertinent part provides:

E. *Minimum Class Prices and Butterfat Differentials to be Paid Producers Pursuant to Sub-sections A, B, C, and D of this Section*

1. Class I Milk

$6.40 per cwt. for milk containing 3.5 per cent butterfat.

1A. Class IA Milk

The producer price for Class IA milk shall be a weighted average on a 3.5 per cent basis for the sales or transfers of milk, computed in accordance with the provisions as outlined in Section IV, Sub-section B. Also, sales of milk made directly to military installations for which a specified price has been fixed for the period, shall be included when computing the weighted average price for Class IA milk.

When the average price to be paid for Class IA milk is equal to or higher than the Class II price, it shall be allocated to producers following Class I. When the average price for Class IA milk is less than the Class II price, it shall be allocated to producers following Class II.

2. Class II Milk

$4.35 per cwt. for milk containing 3.5 per cent butterfat.

3. Class III Milk

The Class III price for milk containing 3.5 per cent butterfat shall be the average of the premium or cooler grade milk prices to be paid per cwt. for milk of 4 per cent butterfat received from producers by the following plants as reported to the Milk Commission, less $.30 per cwt.:

Carnation Company, Statesville, N. C.

Kraft Foods Company, West Jefferson, N. C.

The Borden Company, Chester, South Carolina

White House Milk Company, South Boston, Va.

Sealtest Foods, Christiansburg, Va.

*Except* a distributor may deduct from the price received, on a 3.5 per cent basis, for milk sold to a processing plant to be used for manufacturing purposes *only*, a maximum receiving and handling allowance of $.10 per cwt., when such milk is actually received in the plant and reloaded. No receiving or handling allowance shall be deducted from the price received on sales to a manufacturing plant, when such milk is diverted directly from farm routes to a manufacturing plant. *Further*, no receiving or handling allowance shall be permitted on the sale or transfer of Class III milk between plants of the same company. On the sale or transfer of milk to a

the milk. The principal classes of milk thus provided for are Class I, (inclusive of Class IA), Class II, and Class III, i. e., milk for nonfluid uses such as, among others, ice cream and cheese. The fluid uses, Classes I and II, command the higher price, with Class I commanding the higher price of the fluid uses. The regulations regulate the price to be paid by the distributor to the producer for milk, but do not regulate the price to be paid by purchasers from the distributor.

### The "Base" System used in Apportioning Producer Proceeds

The North Carolina distributors make payment for the milk delivered by the producers directly to the producers, even to those producers who are members of Southeast with some minor exceptions where the payments due a producer are made to Southeast who in turn pays the producer after making agreed deductions under its membership agreement.

Milk marketed to distributors licensed by the North Carolina Milk Commission is marketed under the "base" system. The "base" system, as used in North

Carolina, is a method used to allocate the monies a distributor pays to the individual producers for milk delivered to and included in the plant pool of the particular distributor. Under the pool arrangement the milk delivered by a producer to a distributor is pooled with all other milk delivered by other producers to the distributor, and the producer price is computed on the basis of the class utilization of that plant. The base does not affect the distributor's cost. Under the provisions of Order No. Two unless the milk is delivered to the distributor where the producer is a baseholder or to such distributor's account it cannot be included in the distributor's pool. It has to be in the pool in order to share in the utilization in that plant.

Under the statewide base plan set forth in Order No. Two, the base of a producer is determined by the amount of milk produced and delivered during the base-building period (September, November, and December), averaged with the base of the two prior years, by a producer to the distributor to whom he regularly delivers milk, subject to the provisions of Sections V–C–2 and V–C–4 [6] of Order

---

manufacturing plant for manufacturing purposes *only*, the actual additional transportation costs may be applied to such sales. However, in computing the necessary additional transportation, a distributor must take into consideration the mileage of a diverted farm route and the hauling already paid by producers in arriving at the additional transportation costs which may be applied.

On shipments of milk from a North Carolina producer pool to a plant located outside the State of North Carolina, the selling distributor shall classify as Class I all such shipments except when the shipping distributor obtains from the out-of-state purchaser a certification as to the actual use and disposition of such milk and when such certification is *filed* with the Milk Commission monthly report.

The price to be paid for all Class III milk shall be a 3.5 per cent weighted average price per cwt. computed in accordance with the above provisions.

4. * * *

5. * * *

6. The minimum prices to be paid by the purchasing distributor to other distributors for Class IA milk shall not be less than the class-use minimum producer prices established for the marketing area in which the purchasing distributor is located.

7. * * *

6. Sections V–C–2 and V–C–4 provide:

2. Adjustment of Base During Payment Period—When a producer is off the market during a period the base for such producer shall be reduced by the number of days such producer is off the market in order to determine the base which will be used for this producer for such payment period.

4. A producer who has established a base in any marketing area shall be entitled to continue to ship all his milk to the milk distributor where such base is established; provided, that the total milk production, less that retained for family use, is delivered regularly and meets the requirements of the local and state laws and regulations.

No. Two. Section 1F of Order No. Two defines the term "base" as follows:

" 'Base' for a producer means the average deliveries of a producer for a designated period that is established on an equitable basis with all other producers, for allocating classes of milk."

A major purpose of the "base" system is to effect an equitable sharing of the higher paid classes of milk proportionately among all the producers in the pool. For the particular month or other pay period, the proceeds from the milk in the pool utilized in the highest price classes are allocated among the producers in the pool in proportion to the amount of their respective bases in relation to their total base.

In addition to the statewide base plan set forth in Section V of Milk Marketing Order No. Two, there are other base plans in effect in plant pools of various distributors in North Carolina. These base plans are referred to as "special base plans." The only material difference between the statewide base plan and the "special base plan" is the manner in which the producer builds or establishes his base. The special base plans do not affect the computation of the producer payrolls, and the effects of Sections V–C–2 and V–C–4 are the same regardless of the base plan.

Sections V–C–2 and V–C–4 provide for the reduction of the base of a producer if the producer fails to deliver his milk to the distributor holding the particular producer's established base. Southeast has not marketed any of the milk of its members who are North Carolina base

holders, and therefore no member of Southeast in North Carolina has had his base reduced or lost his market by reason of the provisions of Sections V–C–2 and V–C–4.

### Handling Allowances

Sections IV–B–1 and IV–B–2[7] of Order No. Two provide that upon the sale or transfer of bulk milk by a distributor, the selling distributor shall pay the producers from whom he has acquired the milk that price provided for the class in which the milk is to be ultimately utilized, i. e., the class use price, after deducting and retaining a maximum of 15 cents or 25 cents per cwt. depending upon whether the milk is brought into the distributor's plant and sold or delivered directly to the purchaser. Thus a ceiling or maximum on the amount which a distributor may retain out of sales in bulk to cover handling charges is provided. If the milk goes directly from the producer to the purchaser from the distributor, it is said to be "diverted," but if the milk comes into the plant of the distributor and then is delivered to the purchaser, it is said to be "transferred."

### Milk Utilized by the Military

Section IV–A–1A[8] of Order No. Two defines Class 1A milk as including all bulk milk sold to other distributors or transferred between branches or plants of the same company for fluid uses, including transfer for military use for which a producer price may apply different from Class I. Section IV–B–1[9] of Order No. Two provides that on the sale or transfer of bulk milk, the selling distributor must pay producers the class-use

---

7. Sections IV–B–1 and IV–B–2 provide:
   1. On the sale or transfer of bulk milk, the selling distributor shall pay producers the class-use prices. Not less than one-half of any amount received above class prices shall be paid to the producers of the selling distributor.
   2. A handling allowance may be deducted on the sale or transfer of bulk milk diverted directly from farm routes but such allowance shall not exceed 15¢ per cwt. On milk received in the plant and reloaded for sale or transfer, a handling allowance may be deducted but such allowance shall not exceed 25¢ per cwt. Such allowance shall be applicable only to milk sold or transferred for Class I, Military, or Class II usage. Further, no handling or receiving allowances shall be applicable to any portion of a bulk transfer which is classified as Class III under this provision.

8. See Note 5, supra.

9. See Note 7, supra.

price, which producer price is set by the Commission.

Southeast has a contract with Associated Distributors, Incorporated, Charleston, South Carolina, to furnish to Associated Distributors, Incorporated, milk to be used for consumption on various military reservations. Southeast does not have a contract with a military installation to furnish milk nor has it had such contract. Southeast has always complied with its contract with Associated Distributors, Incorporated. The Commission, under Order No. Two, sets the price that is to be paid by North Carolina distributors to producers for milk acquired by the distributors from their producers for sale by the distributors to out of state purchasers, not the price Southeast must pay the distributor for the milk.

The Commission does not set or deal with the sale price of processed milk sold by North Carolina distributors or others to a military installation. The Commission does set the minimum price which must be paid by the distributor to the producer for milk ultimately utilized to fill a military contract, and for particular military contracts the prices so set are the same for all distributors. North Carolina distributors bid different prices on the same military contract and compete in their bidding with Associated Distributors, Incorporated, for some military contracts. From time to time the military contracts switch from one distributor to another due to competition for these contracts.

## DISCUSSION

### I. *The Regulations in Dispute*

It is conceded by Southeast that some regulation of milk is constitutional and it is not contended that Order No. Two or the statutes establishing the authority for the regulations are unconstitutional in their entirety. Rather, the attack is directed to specific provisions.

Essentially, this controversy concerns only Class III milk, which counsel for Southeast chooses to call surplus milk. The defendants deny that Class III milk is surplus milk in any real sense and

insist that products such as ice cream, cottage cheese, and a reserve for spoilage, shrinkage, and unpredicted demands, and similar uses or events for which Class III milk is used, are essential and necessary in the operation of any distributor's business.

Southeast contends that the effect of IV–B–2, providing for handling allowances, V–C–2, providing for the reduction of the base of a producer who does not deliver all of his milk to the distributor holding the producer's base, and V–C–4, providing that the producer must deliver all of his milk to the distributor with whom he has established his base, is to lock the surplus milk of its members in the milk pool of the North Carolina distributors, so that Southeast cannot get the surplus milk and market it for its members in the more remunerative Class I and II fluid milk classifications. It is to be remembered that Class I and II milk returns a higher market price to the producers than Class III or surplus milk. These provisions of Order No. Two, Southeast argues, impose a penalty on Southeast and its members by reducing the member's base when the producer does not make delivery of his milk to the North Carolina distributor by subjecting him to loss of base entirely if he does not deliver all his milk and by exacting a handling charge of 15 cents or 25 cents per hundred weight, depending upon whether the milk is transferred or diverted. It follows, Southeast says, that these provisions of Order No. Two are causing large losses to it and its members as much of the Class III milk could, save for these regulations, be marketed by it in the higher and more profitable fluid milk classifications, and that these regulations impose an impermissible burden on interstate commerce, and deny to Southeast and its members equal protection of law and due process of law under the Fourteenth Amendment.

Significant in this controversy is the conceded fact that a distributor must have some surplus milk to operate. It is disputed as to what per cent of the total milk utilized by a distributor is needed

as an operating surplus. With reference to the surplus milk, the distributor has a choice. He can use it in Class III uses or he may sell it in bulk and charge back to the producer the handling charge. This option to a distributor to collect a handling charge Southeast contends gives to the distributors an unfair price advantage in bidding in the milk market.

With respect to the alleged penalty provisions of V–C–2 and V–C–4, conspicuously Southeast in its membership agreement provides that should a "Member fail to deliver all of his milk as herein provided, the member agrees to pay the Association [Southeast] five cents (5¢) per gallon of milk delivered * * * sold, or withheld * * *". In explanation of this charge, Southeast says that the charge is justified by the fact that it is a mere selling agent and its members in effect partners one with the other. Obviously, the effect of the provisions are the same, that is, to influence the producer to deliver his milk to the distributor with whom he has an established base under Order No. Two and to Southeast under its membership agreement.

The regulations of Order No. Two do not regulate Southeast. It can carry out totally the provisions of its agreement with its members as spelled out in its membership agreement, and not violate any regulation of Order No. Two. Nor would the producer-members of Southeast, if they complied with their agreement with Southeast, be in violation. Order No. Two regulates distributors, not producers, by setting up procedures whereby if a producer wishes a guaranteed market for his milk with a distributor he may, but is not required, to establish a base with the distributor and then the distributor must pay the producer the price set by the Commission. Southeast is not a distributor and has never been subject to the regulations, and any North Carolina producer may market his milk with Southeast or with anyone he wishes in or out of North Carolina.

In summary, V–C–2 simply says that to the extent that a producer does not contribute to the distributor pool, he does not participate in the proceeds from that pool. If a producer does not deliver some days in a month, his participation is reduced proportionately. If the producer doesn't like the price his distributor pays or otherwise is dissatisfied, he can go wherever he can get a deal to his satisfaction. V–C–4 says that if the producer wants a guaranteed market for his milk with a North Carolina distributor, he must deliver it less family uses to the distributor where he has an established base.

Next, Southeast contends that IV–A–1 and IV–E–1A constitute an impermissible burden on interstate commerce as applied to Southeast and its members. Briefly stated, these regulations define the milk products, included in Class 1 and Class 1A and establish the minimum price that the producer will be paid by the distributor for Class 1A milk. Class 1A includes milk which is ultimately sold to military installations, and includes milk which a distributor has purchased from his producers and then sold to some other distributor or purchaser, such as Southeast, and ultimately used by the military forces.

The regulations do not by virtue of IV–A–1 and IV–E–1A nor otherwise, attempt the regulation of the price Southeast or other purchasers will pay. That price is a matter of bargaining and agreement between the seller of the milk and Southeast or other interested purchaser. The evidence is conclusive that Southeast has over a long period negotiated purchases from North Carolina distributors.

Finally, with reference to the provisions of Order No. Two, it is alleged that the provisions of IV–C–1 and IV–C–2[10]

---

10. Sections IV–C–1 and IV–C–2 provide: 1. Milk supplied by base-holding producers shall at all times be included in the highest price classification before milk received from other handlers and other sources is classified. 2. No Class I, Class IA or Class II milk shall be purchased, received, han-

constitute a bar on the importation of milk into North Carolina and impose an impermissible burden on interstate commerce. These sections, in brief, require that a distributor first use the milk of base holding producers before using milk from other sources. In resolving the issue raised as to these particular sections, it is important that neither by the provisions of IV–C–1 and IV–C–2 nor in their application is the milk supply for distributors limited by state lines.

## II. *Interstate Commerce*

In 1966 some 35 North Carolina distributors were licensed under Order No. Two, and there were approximately 2,700 base holding producers. These producers lived in North Carolina, South Carolina, Tennessee, and Virginia. A producer is not required in order to deliver to a licensed distributor in North Carolina and participate in the plant pool to be a citizen and resident of North Carolina. Producers who are citizens and residents of North Carolina regularly sell and deliver their milk to distributors in other states, and to various other purchasers who are not licensed and regulated by the North Carolina Milk Commission.

Cases having particular relevancy are Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964); Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Lehigh Valley Co-op. Farmers, Inc. v. United States, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962).

Counsel for all parties cite *Polar* in their briefs. Polar, the appellant, was a processor and distributor of fluid milk and milk products in the State of Florida. Prior to the Florida milk regulations, Polar purchased 70 per cent of its milk from sources outside of the State of Florida. The effect of the regulations was that Polar had to purchase all the milk of its Florida producers at minimum prices established by the Milk Commission. Under the challenged regulations, for example, an Alabama or Georgia producer could not establish a base with Polar and become one of its regular producers. Since the regulations required the allocation of the Florida producers' milk first to the Class I fluid uses, the milk purchased by Polar from sources out of the state was destined for use in the less remunerative classifications.

It was contended by Polar that the regulations denied it due process and equal protection of law and unduly burdened interstate commerce. The Supreme Court in *Polar* held that the Florida regulations could not withstand the attack based on the Commerce Clause; that a State may not preempt its market for its own producers to the exclusion of production from other areas and may not "[I]n the sole interest of promoting the economic welfare of its [own] dairy farmers, insulate the Florida milk industry from competition from other States."

It is interesting that the Supreme Court has decided most of the milk cases on the basis of the Commerce Clause although almost without exception it has been argued that the milk regulations also violated the Fourteenth Amendment rights of due process and equal protection. In *Polar,* the appeal was not pursued before the Supreme Court on the theory of Fourteenth Amendment violations, and in n. 7 to the opinion, in referring to the fact that the contentions about denial of due process and equal protection of law were not brought forward on appeal, the court stated that such arguments "appear on their face to be without merit."

The facts adduced in the subject case do not reflect a comparable situation to

dled, or obtained from any source other than from approved producers or other North Carolina licensed distributors, without the express permission of the Milk Commission, except where it can be established by the distributor that ap-

proved milk is not available within the state and a permit is obtained from the N. C. Department of Agriculture in accordance with the state import law.

that in Polar. There the Florida regulations effectively established a barrier to milk from other states. While under the North Carolina regulations, there are many producers in other states who have established bases with North Carolina distributors and regularly deliver their milk. Nevertheless, the reverse of the situation is what Southeast complains about; that is, its inability to get the milk from its North Carolina members without their base with the North Carolina distributor being reduced and the inability to get milk from North Carolina distributors without the handling charge being assessed. The short answer to this is that Southeast is free to get its milk from any producer it wishes in North Carolina whom it can convince that a greater return for the milk will be provided than realized by marketing it with a North Carolina distributor. The provisions of Order No. Two do not prevent Southeast from carrying out its membership agreement, and its North Carolina member-producers can do whatever they desire with their milk, free of any violation of the North Carolina regulations. It is only required that the producer deliver his milk regularly to his North Carolina distributor if he desires a guaranteed market with his North Carolina distributor.

It is contended by Southeast that it and its members are regulated by the penalty provisions of V–C–2 and V–C–4 in that it would be economically unsound for its members to hazard the loss of their base with their North Carolina producer, and cite in support thereof *Lehigh.* In *Lehigh,* the plaintiffs operated milk processing plants in Pennsylvania. The Secretary of Agriculture promulgated regulations which required milk handlers who brought milk into the New York-New Jersey area from outside the area, Pennsylvania in this instance, and sold it for fluid uses to pay to the producers in the New York-New Jersey area, through a producers settlement fund, the difference between the minimum price set for fluid milk and the minimum price for surplus milk. In

*Lehigh,* the Government contended that the plaintiffs had the choice to join the market pool area and avoid the compensatory payments and hence plaintiffs had no right to complain. The court rejected the Government's contention.

Southeast argues that the contention of defendants that Southeast had a choice of marketing at any time all of its North Carolina base holding members' milk free of the provisions of Order No. Two is fully rebutted by the decision in *Lehigh.* But the choice in *Lehigh* was vastly different from the choice available to Southeast. In *Lehigh* the choice or "election" available to the plaintiffs was to join the pool and be "forced to pay the 'blend price' to all their producers wherever located and account to the Producer Settlement Fund for all milk wherever sold" or stay out of the pool and make compensatory payments of the difference between the minimum price set for fluid milk and the minimum price for surplus milk. The North Carolina regulations leave Southeast in quite a different position. Southeast can take its members' milk at any time, and the producers can deliver their milk to Southeast free of any regulation.

Southeast's position is that all regulations referred to in its complaint, that is, Sections IV–A–1, IV–B–2, IV–C–1, IV–C–2, IV–E–1A, V–C–2, and V–C–4 unreasonably burden interstate commerce. The evidence supports the finding that a producer or distributor in North Carolina may sell to whomever he wishes, in or out of North Carolina, and at whatever price the buying and selling parties can agree upon; that the price regulated is that price the North Carolina distributor must pay the producer if and when the producer voluntarily establishes a base with a distributor and voluntarily delivers his milk to that distributor; and that title to the milk passes to the distributor upon delivery of the milk and the distributor is then free to sell and deliver the milk in the channels of interstate commerce to Southeast or any other parties free of any regulation as to price or otherwise.

■ The regulation of the production and sale of any commodity can be said to have some affect on interstate commerce. Whether it is direct and forbidden or indirect and permissible is not always easy to determine. The word "direct," in its ordinary sense, means to operate proximately as opposed to remotely. We do not find that the regulations here complained of, singularly or collectively, produce an impermissible effect on interstate commerce.

### III. *Due Process and Equal Protection*

■ Southeast by its membership agreement developed a plan for marketing the milk of its producer-members. Under the terms of its agreement, *inter alia,* it was provided that: (1) if a member fails to deliver all of his milk to Southeast, a penalty of 5 cents per gallon marketed elsewhere is assessed; (2) the milk of its members is to be paid for in cash, revolving capital certificates or credits; and (3) the members appoint Southeast as their agent for purposes of amending certain regulations. Southeast in this action in effect complains about competition by North Carolina distributors and that the regulations have the result of making it difficult for it to carry out a plan which it deems would be economically better for its members. What was said in Hegeman Farms Corp. v. Baldwin, 239 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259 (1934), a case factually quite distinguishable from the subject case, is appropriate here. There the court states:

> "The appellant would have us say that minimum prices must be changed whenever a particular dealer can show that the effect of the schedule in its application to himself is to deprive him of a profit. * * * The Fourteenth Amendment does not protect a business against the hazards of competition."

In *Hegeman Farms Corp.* the plaintiff, a wholesale milk dealer was complaining, among other things, about the minimum selling prices set for milk dealers. Less drastic than price setting for dealers are the provisions of Order No. Two, about which the plaintiff complains, as the provisions simply provide for an equitable method of allocating among producers the available proceeds from milk which has been sold by the distributors.

■■ Insofar as the requirements of due process are concerned, it is required that the laws or regulations be reasonable, not arbitrary or capricious, and that the means selected have a real and substantial relation to the object to be attained. "If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio." Nebbia v. People of State of New York, supra.

■ We think the challenged provisions of Order No. Two are not so arbitrary and capricious as to constitute a violation of due process. The provisions have a direct and reasonable relation to the accomplishment of a proper legislative purpose—to promote, in an industry vital to the public health and welfare of the people, the production, transportation, processing, storage, distribution, and sale of milk in a fair, just, and equitable manner with pure and wholesome content.

■ The equal protection clause of the Fourteenth Amendment to the Constitution of the United States forbids a state to "deny to any person within its jurisdiction the equal protection of the laws." Certainly, as to the producers, their rights rest upon the same rules, and clearly meet the test of equal protection. However, the argument of Southeast goes further, and it contends that the regulations prevent Southeast from taking advantage of the out of state markets while allowing North Carolina distributors to sell in these markets without penalty. There is abundant authority that control over the business of producing or dealing in milk, and milk products, is within the police power of the state, and reasonable regulations of the industry does not vio-

late the constitutional right of equal protection. Nebbia v. People of State of New York, supra. Indeed, Southeast provides under its membership agreement that the failure of its members to deliver milk will result in a penalty upon the defaulting member, and it is in evidence that base plans, though varying in their provision from locality to locality, are accepted in the industry as an equitable way of apportioning the proceeds. In the handling of bulk milk, there is convincing evidence of expenses involved justifying the handling allowances provided under IV–B–2 and this provision cannot be said to be arbitrary, capricious, or without factual basis.

■ There is no impairment of contract as Southeast is free to do that which it wishes with its members' milk. Southeast can force its members to market their milk with it, and it is reasonable to assume that its members will comply with the agreement and Southeast will take the milk when Southeast can market the milk at a better price and otherwise more advantageously than it can be marketed through the North Carolina distributors.

### IV. Federal Procurement Statute and Capper-Volstead Act

■ Southeast contends that the challenged North Carolina regulations and law are in conflict with the Capper-Volstead Act, 7 U.S.C. § 291, and the Federal Procurement Statute, 10 U.S.C. § 2301 et seq. Of course, if the North Carolina law and regulations are in conflict with federal legislation, then the federal legislation must prevail. In Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963), it was held that California's attempt to regulate prices for which a distributor sold to United States establishments was invalid. But in Polar, one of the more recent pronouncements on milk regulations, the Court stated that Paul did not necessarily apply where the price regulated was that which the distributor paid the producer. Specifically on this point, it was stated in Polar:

"Florida does not purport to regulate the price which Polar must charge for milk sold to the Government on or off military bases. Florida regulates only the price which Polar must pay [producers] for its milk, not what it must sell it for." 375 U.S. 361, 379, 84 S.Ct. 378, 389, 11 L.Ed.2d 389, 400.

Here, there is no regulation of distributor prices. Apparently, the prime customer of Southeast is Associated Distributors, Inc., a supplier of milk to military establishments. The price paid by Southeast to North Carolina distributors for milk is a matter of agreement between Southeast and the distributor, and there is competition between some North Carolina distributors and Southeast for the military contracts. Also, there is competition between North Carolina distributors for the military contracts, often resulting in the submission of different bid prices on the same contract.

■ We see no conflict between the North Carolina Milk Commission Law and Regulations and The Federal Procurement Statute, and find no merit in the contention that there is conflict with the Capper-Volstead Act. An examination of the Capper-Volstead Act discloses no intent by Congress that associations formed thereunder enjoy a special status so as to exempt them from the application of state regulations adopted in the usual and proper exercise of state police power.

### V. Constitutionality of Section 106–266.7 of the General Statutes of North Carolina

■ In its brief under the section entitled "Relief Request," Southeast asks that § 106–266.7, Article 28B, Chapter 106, of the General Statutes of North Carolina, referred to as the North Carolina Milk Commission Law, be declared unconstitutional. The statute provides for a Milk Commission with a majority of its members having a direct and pecuniary interest in the matters with respect to which the Commission must

exercise its powers,[11] and therefore the plaintiff and its members, it is contended, are denied due process of law. Under the North Carolina Milk Commission Law, a majority of the nine members of the Commission constitutes members with the following interests: (1) one producer; (2) one producer-distributor; (3) two distributors; and (4) one in the business of retailing packaged milk. Even though under § 106–266.17[12] of the Milk Commission Law the right is given

11. Section 106–266.7 provides:
*Milk Commission created; membership, chairman; compensation; quorum; duties of Commissioner of Agriculture and Director of Agricultural Experiment Station.*—(a) There is hereby created a Milk Commission to be designated as the North Carolina Milk Commission, consisting of nine members as follows: One of whom shall be a producer, who is not directly or indirectly engaged in the distribution thereof; one of whom shall be a producer-distributor; two of whom shall be distributors; three of whom shall be representatives of the public interest who are not connected in any manner with the production or distribution of milk; one of whom shall be in the business of retailing packaged milk through a retail grocery establishment, or through a restaurant or through a drugstore retail outlet, or otherwise engaged in the business of retailing packaged milk other than in the processing and distribution of same; and the ninth member shall be the Commissioner of Agriculture serving ex officio, without voting privileges except in cases of tie votes, but his presence and attendance at meetings shall be counted in determining a quorum of the Commission. Except for the Commissioner of Agriculture, all members of the Commission shall be appointed by the Governor. Of the members of the Commission first appointed, the Governor shall designate one for a term of one year; one for a term of two years; one for a term of three years; and three for a term of four years. Thereafter, appointments shall be made for terms of four years.

(b) The Commission shall select one of its members who shall act as chairman and shall provide such administrative personnel as may be necessary to carry out the provisions of this article.

(c) The pay of the members of the Commission shall be set by the Governor and the Council of State.

(d) Five members of the Commission shall constitute a quorum.

(e) The Commissioner of Agriculture and the Director of the Agricultural Experiment Station of North Carolina State University at Raleigh shall provide as far as practical without additional compensation such technical and other services as may be necessary to carry out the provisions of this article.

(f) The Commission shall, subject to the limitations herein contained and the rules and regulations of the Commission, enforce the provisions of this article, but no official act shall be taken, rule or regulation be promulgated, or official order be made or enforced, with respect to the provisions of this article, without the approval of the majority of the members of the Commission.

12. Section 106–266.17 provides:
*Appeals.*—Any person or persons aggrieved by an order of the Commission refusing a license, to reissue or revoke or suspend a license, to a distributor or producer-distributor or to transfer a license from one person to another, and any order of the Commission applying only to a person or persons, and not otherwise specifically provided for, may be reviewed upon appeal to the superior court. Any person or persons aggrieved by an order of the Commission fixing, revising or amending the price at or the terms upon which milk may be bought and sold, or any other order, action, rule or regulation of the Commission, may, within forty (40) days after the effective date of such action, rule, regulation or order, appeal therefrom to the superior court. No such appeal shall, in either case, act as a supersedeas except on a special order of the superior court allowing a supersedeas. Before any such person, or persons, shall be allowed to appeal, he shall file written notice of appeal with the Commission and within ten (10) days after the receipt of said written notice of appeal it shall be the duty of the Commission to certify a complete record of its proceedings with all papers or evidence to the clerk of the superior court of the county in which the appellant resides or to the clerk of the superior court of a county in which the violation occurs. The cause shall be entitled "State of North Carolina on Relation of the North Carolina Milk Commission against (here insert name of appellant)," and said cause shall be placed on the civil issue docket of the superior court of such county and

an aggrieved party to a trial de novo in the Superior Court, we agree with Southeast that it is entitled to consideration in the first instance by a commission constituted in compliance with due process and which in its operation affords due process of law.

Southeast relies heavily on the case of Johnson v. Michigan Milk Marketing Board, 295 Mich. 644, 295 N.W. 346 (1940), and states that no federal decision directly in point has been found. Counsel for the defendants counter that the *Johnson* case is readily distinguishable from the subject case as the Michigan Statute made the findings of fact by the Board conclusive, in the absence of fraud, with review by the Supreme Court limited to questions of law, and that the Milk Commission Law in North Carolina provides for a de novo hearing in the Superior Court.

The defendants call attention to the case of Board of Supervisors of Elizabeth City County v. State Milk Commission, 191 Va. 1, 60 S.E.2d 35 (1950), App. Dismissed, 340 U.S. 881, 71 S.Ct. 198, 95 L.Ed. 640, which defendants contend repudiates the *Johnson* case.

In Board of Supervisors of Elizabeth City County, the regulations provided for a three member commission, one engaged in production of milk, one in the distribution thereof, and a third having no connection as a producer or distributor.

In *Johnson*, the milk marketing board consisted of five (5) members, inclusive of the Commissioner of Agriculture, as follows: Two (2) milk producers; one (1) milk distributor; and one (1) consumer not connected with production or distribution of milk. The court stated, in holding invalid the Michigan statute, that "it is essential that the Board be impartial in its composition. The Act is fatally defective in its provision for

the appointment of the personnel of the Board."

In Board of Supervisors of Elizabeth City County, which came ten years later than *Johnson* and upon appeal to the Supreme Court of the United States was dismissed, the court stated:

"The Act expressly declares that each of the three groups interested in the price of milk, the producer, the distributor, and the consumer shall be represented on the Commission for the obvious purpose of having a well rounded commission whose knowledge of the problems of and experience in the milk industry will enable them to act fairly and intelligently on the question presented."

██ A person aggrieved by a decision of the Commission in North Carolina has a right of appeal and to be heard *de novo* in the Superior Court. We hold that the rights of the parties are fully protected. Since most people use milk or milk products, a situation is presented where it is near impossible to select a commission totally divested of any interest in the milk industry. As the voluminous record in this case clearly discloses, the milk industry is an involved and complicated one, and the administrative regulation of it best be entrusted to those individuals best equipped through knowledge and experience to perform the task. These individuals most likely will be found within the industry and not among the public at large.

VI. *Motion to Dismiss*

Consideration has been given to the defendants' contention that the Court should reconsider and allow their motion to dismiss, which motion was heard on the 17th day of June, 1967, and denied by order entered the 28th day of June, 1967. We find no reason to disturb the order denying the motion.

shall be heard de novo under the same rules and regulations as are prescribed for the trial of other civil causes. The Commission shall be deemed to be a party plaintiff on such appeal and at its request may present its contentions,

make arguments, and take any other legal steps that a party to a civil action may take in the superior court, including the right to appeal to the Supreme Court of North Carolina.

We conclude that neither the challenged regulations of Order No. Two nor Section 106, of Article 28B, Chapter 106, of the General Statutes of North Carolina contravene the Federal Constitution. A judgment will be entered accordingly.

The foregoing is adopted by this Court as Findings of Fact and Conclusions of Law.