KACHIAN, Appellant, v. OPTOMETRY EXAMINING BOARD, Respondent.*

*Nos. 112, 113. Argued September 2, 1969.—Decided September 30, 1969.*
(Also reported in 170 N. W. 2d 743.)

---

\* Motion for rehearing denied, without costs, on November 25, 1969.

4

For the appellant there were briefs by *Michael, Best & Friedrich,* and oral argument by *Scott H. Engroff,* all of Milwaukee.

For the respondent the cause was argued by *David J. Hanson,* assistant attorney general, with whom on the briefs was *Robert W. Warren,* attorney general.

ROBERT W. HANSEN, J.   While the parties involved are the same in the two appeals before us, the issues raised in each are different and separable.

However, the exact status of an optometrist is involved in both cases and will be discussed first. It is important to keep in mind the distinction between an optometrist, a dispensing optician and an ophthalmologist. An optometrist is licensed by the state to examine eyes for refractive errors and to recommend corrective lenses. A dispensing optician needs no license and is concerned with the fitting or adaptation of lenses or eyeglasses. An ophthalmologist is a medical doctor specializing in the treatment of diseases of the eye.

CASE No. 112.

In challenging the detailed minimum examination that the board by rule requires of all optometrists in this state, plaintiff relies heavily upon the Wisconsin case holding that "Optometry is readily distinguished from a

profession in the practice of which diseases of the eye are treated." [1] In that decision, optometry is described as a "skilled calling" but not ". . . a profession involving a relation of special confidence between practitioner and patient." [2] On the issue there presented of corporate employment of optometrists to examine eyes and prescribe glasses, the distinction is important and correctly stated. However, the decision continues to state the purpose of legislation dealing with optometry as being

". . . to protect the public against practice by unqualified persons, and to have optometrists who are able to measure defects of the eye and to adapt the light waves which enter the eye in accordance with optical principles so as to produce focused and single vision with the least abnormal exertion on the part of the eye." [3]

The key phrase here is ". . . to protect the public . . ."

Regulations and rules governing the practice of optometry depend not upon the status given the optometrist, but on their reasonable relationship to protection of the public. It is the linkage between the practice of optometry and the public health and safety that provides the firm foundation for licensing requirements and both legislation and administrative rules based on such legislation in the field of optometry.

The rule (OPT 7.04. Minimum Examination) challenged on this appeal provides "In the absence of compelling reasons to the contrary . . ." that it shall be considered unprofessional conduct for an optometrist to fail to make a minimum examination in all cases and to keep a permanent record thereof. This minimum examination includes:

---

[1] *State ex rel. Harris v. Kindy Optical Co.* (1940), 235 Wis. 498, 501, 292 N. W. 283.

[2] *Ibid.*

[3] *Id.* at page 502, quoting from Harrington's, *History of Optometry* (1929), p. 24.

1. Complete case history.
2. Visual acuity at far and at near.
3. Detailed report of the external examination.
4. Ophthalmoscopic examination (an examination of the inner parts of the eye by use of an ophthalmoscope).
5. Corneal curvature.
6. Retinoscopy (an examination to determine the refractive error of the eye).
7. Amplitude of convergence and accommodation (test to determine muscle control).
8. Phorias and duction (also deals with muscle control).
9. Subjective findings, far and near.
10. Fusion.
11. Stereopsis (determines depth perception).
12. Color vision.
13. Visual fields (determines peripheral vision).
14. Prescription and visual acuity obtained.

The board's purpose in requiring such complete and comprehensive eye examination obviously is to provide maximum protection to the public by insisting upon a minimum examination procedure. Does the rule and its various individual provisions meet the test of reasonableness? At the trial both plaintiff and defendant produced expert witnesses on this point. Their testimony was in agreement as to the nature of each test required. They disagreed on the usefulness and significance of many of the tests required. Plaintiff's witnesses testified that many of the tests were useless, particularly those that were pathological or aimed at discovering indications of underlying pathology. Defendant's witnesses testified that all tests required were necessary and served a useful purpose. The trial court found the tests required, all of them, to be reasonable. The fact that experts disagree on the desirability of a particular standard is not necessarily a valid objection to such standard.

Agreement among experts is a rare enough phenomenon in many fields. We quote with approval, and find controlling, this statement as the scope of judicial review of administrative regulations where experts divide on the issue of reasonableness:

"In order to set aside a regulation, it must be clearly unreasonable. If reasonable minds may well be divided on the question, the administrator must be upheld. It must be shown that no reasonable administrator would have made such a regulation and that it is so lacking in reason that it is essentially arbitrary." [4]

It is, however, not enough that a challenged board regulation be found to be reasonably intended and calculated to protect the public health and safety. No administrative agency may issue a rule or regulation that is not legislatively authorized, most usually in the statutes creating such agency. Plaintiff claims that the minimum examination rule is not so authorized and, therefore, beyond the power of the board to enforce. The trial court held that the rule was enacted pursuant to sec. 153.08 (1) (a), Stats.,[5] and implements the policy behind ch. 153 which is to protect the public.

We concur with the trial judge's finding on this point. The rule requiring a minimum examination deals with conduct which would deceive and could defraud the public. The ordinary citizen does expect a complete examination when he engages the services of an optometrist. The rule attempts to make sure that he receives what he has paid for and has every reason to expect. The inclusion of examinations and tests that may reveal pathological conditions is not to be viewed as an extension of the practice of optometry. The only

---

[4] 2 Am. Jur. 2d *Administrative law*, p. 133, sec. 304.

[5] Sec. 153.08 "Unprofessional conduct. (1) Unprofessional conduct includes without limitation because of enumeration:

"(a) Any conduct of a character likely to deceive or defraud the public."

purpose served by such testings is to make more likely the discovery of pathological eye conditions and the informing of the individual of such alerting or alarming indications. The optometrist may not treat such condition, but the public health and safety are served by his informing the individual of the results of the test and referring him to an ophthalmologist for futher examination, diagnosis and, where needed, treatment. If this were not within the legislative intention, there would be no purpose served by requiring optometric candidates to be informed on the pathology of the eye before a license to practice optometry is granted.[6]

To the argument that compliance with the minimum examination rule might require a person to submit to a particular examination that he did not want to have made, the answer is that the rule deals with what the optometrist must offer, not what the person examined must accept. If a person for any reason whatever were to refuse to have a certain eye test performed, that would be a "compelling reason" under the rule for not administering such test. Failure to perform a test to which objection was made would not constitute a violation of the rule as it is stated.

The plaintiff introduced testimony to the point that three members of the board had themselves failed to fully comply with the minimum examination rule in making eye examinations in their private practice. The trial judge referred to this as an attempt to embarrass the three board members involved. If so, it certainly must have succeeded. However, inconsistencies in enforcement, like inconsistencies in decisions,[7] however re-

---

[6] *See* sec. 153.04, Stats.

[7] "Mere inconsistency on the part of an administrative agency does not of itself rise to the dignity of a violation of the constitutional right to equal protection before the law." *Nick v. State Highway Comm.* (1963), 21 Wis. 2d 489, 496, 124 N. W. 2d 574.

grettable, do not, standing alone, invalidate an otherwise valid regulation. There must, in addition, be a clear indication of intentional or purposeful discrimination.[8] That is not charged nor established here.

CASE No. 113.

The second appeal by the same party plaintiff from a second declaratory judgment rendered by the same trial judge and involving the same party defendant brings a single issue to this court. Presented in the trial court on stipulated facts, the challenge is to the statutory composition of the Wisconsin Board of Examiners in Optometry. The objection is to sec. 153.03 (1), Stats., which specifies that one of the requirements for membership on the board is that the person has been ". . . a resident of this state actively engaged in the practice of optometry for at least 5 years immediately preceding his appointment."

Plaintiff claims that, since all members of the board must be optometrists, any determination they may make is ipso facto affected. by their being in competition in the same skilled calling with any person being examined or disciplined. The claim is not one of actual bias. No claim of instances of misconduct or prejudice is made against any board member, past or present. Rather, the contention is that there is an inbuilt, inescapable even if indirect, financial interest involved when an optometrist board member sits in judgment on a fellow-optometrist.

Plaintiff relies upon a United States Supreme Court decision [9] where that tribunal held unconstitutional that section of the Bituminous Coal Conservation Act of 1935

---

[8] *Snowden v. Hughes* (1943), 321 U. S. 1, 8, 64 Sup. Ct. 397, 88 L. Ed. 497, cited in *Nick v. State Highway Comm.*, *supra*, fn. 7, p. 496.

[9] *Carter v. Carter Coal Co.* (1936), 298 U. S. 238, 56 Sup. Ct. 855, 80 L. Ed. 1160.

which established a regulatory board, the members of which were selected on the basis of which bituminous coal producers had the largest production and the greatest number of employees for the previous year. The Goliath over David aspect of this method of selecting board members is evident. The board, created to fix minimum wages and maximum hours, was not established as a public body. While the decision has had its critics,[10] it emphasized the fact that the nonpublic agency status of the regulatory board meant the procedural safeguards attendant thereto were absent and cast an additional cloud on the delegation of legislative authority aspect of the case. We need not join the critics to hold that the situation there presented to the court is distinguishable from the situation before us, both in the administrative agency and delegation of authority aspects. There are no direct economic controls here involved; the board here acts as an administrative agency and public body; the challenge here is not to unlawful delegation of powers but to the composition of the board. At least one state, Michigan, has held to the contrary,[11] but we would follow the general rule on members of a professional or occupational group serving on an administrative agency regulating such profession or occupation, which has been stated as follows:

".  .  . it appears to be a general rule that membership in or connection with the same profession or occupation as that of the accused licensee does not alone indicate a disqualifying bias or interest on the part of the questioned tribunal member sufficient to violate due process." [12]

---

[10] See 2 Davis, *Administrative Law Treatise* (1958), pp. 158, 159, sec. 12.03.

[11] See *Milk Marketing Board v. Johnson* (1940), 295 Mich. 644, 295 N. W. 346.

[12] 97 A. L. R. 2d 1210, 1220. *See also Lucas v. State ex rel. Board of Medical Registration* (1951), 229 Ind. 633, 99 N. E. 2d 419 and *State ex rel. Beaddall v. Lonctot* (1963), 62 Wash. 2d 845, 384 Pac. 2d 877.

"Ain brera" is a Hebrew expression, meaning "What are the alternatives?" If the indirect interest deriving from membership in the profession or occupation being regulated disqualifies an individual from serving on a regulatory board, the result would be dentists could not examine dentists, attorneys could not serve on bar examiner boards, pharmacists could not give pharmacy examinations. Would it be preferable, or even workable, to have the dentists giving bar examinations and optometrists giving pharmacy tests? The gain in presumed purity would be matched by a loss in knowledge and experience in drafting and administering professional and occupational rules and regulations.[13] In any event, the question of public policy involved in the composition of administrative agencies is for the legislature to debate and decide, short of constitutional requirements. We find no constitutional invalidity to the statute here challenged. It cannot be held as a matter of law that a member of a certain profession or occupation is disqualified by that fact from serving on an administrative board dealing with such profession or occupation.

Plaintiff also challenges the absence in this statute of a specific provision for the disqualification of a board member where direct conflict of interest or actual bias can be proved to exist. From the absence of a statutory mandate it does not follow that a person who is a member of an administrative agency may not or ought not dis-

[13] "Counsel for respondent cites and quotes from a multitude of cases to the general effect of keeping the fountains of justice pure and of providing tribunals that will give a litigant a fair trial according to the principles of the common law. With the theory of all the pronouncements quoted we heartily agree. But we are confronted with a condition not a theory. The condition is the existence of administrative tribunals, and theory must yield to considerations necessary to the functioning of these tribunals. If the theory of counsel were to prevail, these tribunals would have to go out of existence. And obviously they are here to stay." *Clark v. Blochowiak* (1942), 241 Wis. 236, 242, 5 N. W. 2d 772.

qualify himself from sitting in a case in which he has a direct financial interest or one which he cannot fairly decide. The common-law duty of disqualification applies where no statutory provisions for disqualification are spelled out.[14]

As a footnote to his case on oral argument, plaintiff raised the additional point that the board's authority to issue complaints as well as orders and conduct hearings constitutes a mixing of roles violative of a fair hearing and due process. As a footnote to this decision in response to this argument, we indicate our agreement with the general holding on this contention which has been stated as follows:

"There is authority from several jurisdictions that disqualification for bias or interest will not result where the hearing body or its subordinates, acting within the scope of their proper ministerial functions, participated in the origination of charges against the licensee."[15]

*By the Court.*—Judgments affirmed.

---

[14] "Although an administrative agency cannot possibly be under stronger constitutional compulsions in respect to disqualification than a court, the common-law rule of disqualification applicable to judges extends to every tribunal exercising judicial or quasi-judicial functions. The rule has been applied or recognized in cases of suspension or revocation of licenses . . . An express statutory requirement of disinterestedness is not necessary to the application of the rule, for such statutes are mainly declaratory of the common law . . ." 1 Am. Jur. 2d, *Administrative Law*, p. 859, sec. 63.

[15] Anno. 97 A. L. R. 2d 1210, 1215.