## MORRIS v METRIYAKOOL

Docket No. 46598. Submitted November 12, 1980, at Detroit.—Decided
June 5, 1981. Leave to appeal granted, 412 Mich 884.

Plaintiff, Delores M. Morris, signed an arbitration agreement at
the time of her admission to South Macomb Hospital for a
hysterectomy. Doctor S. Metriyakool, who performed the sur-
gery, had an agreement with the hospital to arbitrate all
claims brought against the hospital or himself by reason of the
operation. Following the surgery, plaintiff developed peritonitis.
She subsequently filed a complaint in the Macomb Circuit
Court against South Macomb Hospital and Dr. Metriyakool
alleging negligence in the surgical procedure which caused her
to develop peritonitis and negligence in failing to promptly

REFERENCES FOR POINTS IN HEADNOTES

[1, 8] 5 Am Jur 2d, Arbitration and Award §§ 8, 9.
  Arbitration of medical malpractice claims. 84 ALR3d 375.
  Constitutionality of arbitration statutes. 55 ALR2d 432.
[2] 5 Am Jur 2d, Arbitration and Award § 6.
  61 Am Jur 2d (Rev), Physicians, Surgeons, and Other Healers § 376.
[3] 16 Am Jur 2d (Rev), Constitutional Law § 212 *et seq.*
[4] 5 Am Jur 2d, Arbitration and Award §§ 98, 99.
  Setting aside arbitration award on ground of interest or bias of
    arbitrators. 56 ALR3d 697.
[5] 16A Am Jur 2d, Constitutional Law §§ 613, 791.
[6, 7, 9, 10, 16] 16A Am Jur 2d, Constitutional Law §§ 855-857.
[7] Disqualification of judge, justice of the peace, or similar judicial
    officer for pecuniary interest in fines, forfeitures, or fees payable
    by litigants. 72 ALR3d 375.
  Disqualification of arbitrator by court or stay of arbitration proceed-
    ings prior to award, on ground of interest, bias, prejudice, collu-
    sion, or fraud of arbitrators. 65 ALR2d 755.
[11] 44 Am Jur 2d, Insurance § 1429.
  61 Am Jur 2d (Rev), Physicians, Surgeons, and Other Healers §§ 28,
    62.
[12, 13, 15] 5 Am Jur 2d, Arbitration and Award § 26.
  61 Am Jur 2d (Rev), Physicians, Surgeons, and Other Healers § 376.
[14] 16 Am Jur 2d (Rev), Constitutional Law § 205.
[17] 16A Am Jur 2d, Constitutional Law §§ 858, 859.
[18] 17 Am Jur 2d, Contracts § 5.

diagnose and treat the condition. The defendants moved for dismissal of the case contending that the execution of the arbitration agreement precluded filing suit in circuit court. George R. Deneweth, J., ordered that the matter be submitted to arbitration and dismissed the plaintiff's complaint with prejudice. Plaintiff appeals, alleging that (1) the composition of the arbitration panel is constitutionally defective on due process grounds, (2) the Medical Malpractice Arbitration Act is unconstitutional or unconscionable as it deprives the patient of a meaningful opportunity to decide whether to relinquish his or her constitutional right to court access, and (3) the arbitration agreement constitutes a contract of adhesion. *Held:*

1. Because submission to arbitration is a voluntary decision and because of the safeguards provided in the process by which the arbitrators are selected, the provisions of the Michigan Medical Malpractice Arbitration Act are not an unconstitutional denial of a plaintiff's right to due process of law even though one of the arbitration panelists is required to be a physician.

2. The Medical Malpractice Arbitration Act is not unconstitutional or unconscionable since it does not deprive the patient of a meaningful opportunity to decide whether to relinquish his or her constitutional right to court access.

3. The arbitration agreement does not constitute a contract of adhesion.

Affirmed.

J. H. GILLIS, J., concurred in the result.

BRONSON, P.J., concurred in part and dissented in part. He would hold that the Medical Malpractice Arbitration Act is unconstitutional for failing to provide for a facially fair tribunal. The act is not unconstitutional for depriving the patient of a meaningful opportunity to decide whether to relinquish his or her constitutional right to court access. The arbitration form clearly informs the patient that arbitration is a substitute for a trial by judge or jury.· Since a declaration of unconscionability manifestly involves policy determinations, in light of the affirmative legislative acts, he is unwilling to find the Medical Malpractice Arbitration Act to be unconscionable. Although a patient's situation and the coercive atmosphere inherent in the hospital setting apparently make it difficult to refuse to sign the arbitration agreement, a patient is not required to sign the agreement as a condition of admission to the hospital or treatment. As such, the arbitration agreement is not a contract of adhesion. He would reverse and remand for trial.

OPINION OF THE COURT

1. ARBITRATION — PHYSICIANS AND SURGEONS — MEDICAL MALPRAC-
   TICE ARBITRATION ACT — STATUTES.

   The Michigan Medical Malpractice Arbitration Act is not uncon-
   stitutional or unconscionable since it does not deprive the
   patient of a meaningful opportunity to decide whether to
   relinquish his or her constitutional right to court access (MCL
   600.5040 *et seq.;* MSA 27A.5040 *et seq.).*

2. ARBITRATION — PHYSICIANS AND SURGEONS — MEDICAL MALPRAC-
   TICE ARBITRATION ACT.

   The reasons for establishing the Michigan Medical Malpractice
   Arbitration Act included the decreasing availability as well as
   rising costs of medical malpractice insurance, the cost of health
   care and the lengthy time involved in the disposition of medical
   malpractice litigation.

3. CONSTITUTIONAL LAW — ACTIONS.

   The burden of proving an alleged constitutional violation rests on
   the party asserting it and such an allegation must be sustained
   not as a matter of speculation but as a demonstrable reality.

4. ARBITRATION — BIAS.

   The potential for bias that would overturn an arbitration award
   must be certain and direct and not remote, uncertain or specu-
   lative.

5. CONSTITUTIONAL LAW — DUE PROCESS — ACCESS TO COURT.

   The right of access to the courts is founded in the due process
   clause and assures that no person will be denied the opportu-
   nity to present to the judiciary allegations concerning viola-
   tions of fundamental rights.

6. CONSTITUTIONAL LAW — IMPARTIAL TRIBUNAL.

   A person is entitled to have a hearing by an impartial and
   disinterested tribunal both in civil and criminal cases (US
   Const, Am XIV).

7. CONSTITUTIONAL LAW — BIAS.

   The risk of actual bias is too great for a fact finder to hear a case
   where the decisionmaker has a pecuniary interest in the out-
   come, or has been the target of personal abuse or criticism by
   the party before him, or was enmeshed in other matters
   involving the petitioner, or might prejudge the case because of
   prior participation as an investigator, fact finder or decision-
   maker.

8. ARBITRATION — MEDICAL MALPRACTICE ARBITRATION ACT — STATUTES.

The Michigan Medical Malpractice Arbitration Act is not an unconstitutional denial of a malpractice plaintiff's right to due process of law because submission to arbitration is a voluntary decision and because of the safeguards provided in the process whereby the arbitrators are selected (MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.*).

PARTIAL CONCURRENCE AND PARTIAL DISSENT BY BRONSON, P.J.

9. CONSTITUTIONAL LAW — DUE PROCESS — IMPARTIAL TRIBUNAL.

*Generally, an individual's right to due process of law does not require a litigant to prove actual prejudice on the part of the tribunal; instead, a tribunal which is composed in such a way that too great a risk exists that one or more of the judges may have a personal interest in the outcome of the proceedings, and thus be biased, is enough to render it constitutionally deficient on due process grounds.*

10. CONSTITUTIONAL LAW — BIAS.

*The test to apply in determining whether a judge in a particular tribunal may be biased and create too great a risk that he will not be impartial is whether the decisionmaker's situation would offer a possible temptation to the average person as a judge to forget the required burden of proof or might make him deviate from the required balance between the competing parties.*

11. PHYSICIANS AND SURGEONS — MALPRACTICE INSURANCE.

*The mere enactment of legislation designed to reduce malpractice insurance costs and to insure its continuing availability does not, by itself, indicate that the legislation suffers from constitutional defects.*

12. CONSTITUTIONAL LAW — STATE ACTION — ARBITRATION — MEDICAL MALPRACTICE ARBITRATION.

*There is more than a semblance of state action in the medical malpractice arbitration system since professional liability insurance is a virtual necessity and hospital-based physicians are compelled by statute to offer to arbitrate disputes with their patients; moreover, the state has mandated the form the agreement to arbitrate must take, how the costs of the arbitration will be shared between the parties, how the arbitrators will be selected, and the composition of the arbitration panel (MCL 600.5040 et seq.; MSA 27A.5040 et seq.).*

13. CONSTITUTIONAL LAW — STATE ACTION — ARBITRATION — MEDI-
    CAL MALPRACTICE ARBITRATION.

    *State action is pervasive in the area of medical malpractice
    insurance and arbitration and, in actuality, the parties to the
    arbitration do not privately determine how the arbitration is to
    work.*

14. CONSTITUTIONAL LAW — WAIVER.

    *There must be an intentional relinquishment or abandonment of
    a known right for the waiver of a constitutional right to be
    effective.*

15. ARBITRATION — MEDICAL MALPRACTICE ARBITRATION AGREEMENT.

    *The arbitration agreement mandated for use by the state for
    medical malpractice arbitrations provides that an information
    booklet explaining the agreement be provided to the patient;
    the agreement, itself, does not require that the patient has
    actually read and understood the information booklet, rather,
    all the patient acknowledges by his or her signature on the
    form is receipt of the booklet, and a near simultaneous handing
    of the booklet and signing of the form is all that is required to
    constitute a waiver under the statutory scheme.*

16. ARBITRATION — MEDICAL MALPRACTICE ARBITRATION ACT — DUE
    PROCESS.

    *The Michigan Medical Malpractice Arbitration Act is unconstitu-
    tional for failure to provide for a facially fair tribunal; the
    portion of the statute relating to the composition of the arbitra-
    tion panels violates due process of law by forcing the litigant to
    submit his or her claim to a tribunal which is composed in such
    a way that a high probability exists that said tribunal will be
    biased against the claimant without mandating the use of an
    arbitration form explicitly detailing the nature of the panel's
    makeup.*

17. CONSTITUTIONAL LAW — RIGHT TO APPEAL.

    *The Michigan Constitution gives criminal defendants a right to
    appeal but no comparable right is extended to civil litigants
    (Const 1963, art 1, § 20).*

18. ARBITRATION — MEDICAL MALPRACTICE — CONTRACTS OF ADHE-
    SION.

    *The medical malpractice arbitration agreement is not a contract
    of adhesion; a contract of adhesion is one in which the con-
    sumer must accept the agreement presented in order to avail
    himself of the goods or services desired and in which the
    consumer really has no opportunity to bargain over terms;
    although the patient's situation and the coercive atmosphere*

*inherent in the hospital setting apparently makes it difficult to refuse to sign the arbitration agreement, a patient is not required to sign the same as a condition of admission or treatment.*

*Lopatin, Miller, Bindes, Freedman, Bluestone, Erlich & Rosen, P.C.* (by *Steven G. Silverman*), for plaintiff.

*Schureman, Frakes, Glass & Wulfmeier* (by *Edward C. Reynolds, Jr.*), for defendant Metriyakool.

*Kitch, Suhrheinrich, Smith, Saurbier & Drutchas, P.C.* (by *Anthony G. Arnone*), for defendant South Macomb Hospital.

Before: BRONSON, P.J., and J. H. GILLIS and CYNAR, JJ.

CYNAR, J. Judge BRONSON has written an exceptionally learned and comprehensive opinion. I agree with his conclusion that the arbitration agreement is not a contract of adhesion. With some hesitation, I also agree that the Medical Malpractice Arbitration Act is not unconstitutional or unconscionable since it does not deprive the patient of a meaningful opportunity to decide whether to relinquish his or her constitutional right to "court access". While having serious reservations, I believe the act to be constitutional even though it requires that a physician serve as one of the three members of the arbitration panel.

Time-tested experience supports the belief that the right to a jury trial as provided under the United States and Michigan Constitutions is a most precious right which should be carefully protected, and waived only if done so knowingly and voluntarily. Perhaps the arbitration agreement would best serve its intended purpose if it

would indicate that one of the three panel members would be a physician or hospital administrator. As important as the right to a jury trial may be, the decreasing availability as well as rising costs of medical malpractice insurance, the cost of health care, and the lengthy time involved in the disposition of medical malpractice litigation were some of the reasons for seeking other means in settling health care disputes.

The Michigan arbitration statute, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.,* took effect on September 1, 1975. The statute provides for arbitration as an alternative to litigation to alleviate the health care crisis. The tug and pull of opposing interests may have resulted in a compromise of less than ideal legislation, if such can ever be achieved in the eyes of all. The bench and jury trial system has been tried and tested. The Michigan statute differs from those in other states in some aspects, particularly from the standpoint of providing binding rather than advisory arbitration. Whether the Michigan medical arbitration act will function adequately to meet the needs of the people remains to be determined by future case experience.

Plaintiff contends that the inclusion of a physician on the arbitration panel is a denial of due process because the physician does not sit as a neutral party but rather as an adversary cloaked in a statutory disguise. It is further contended that physicians invariably unite as a clan against malpractice claimants and that such unity is motivated not by professional ethic but by pecuniary considerations. So, it is claimed, no physician can sit in judgment of a malpractice claim against another physician.

The burden of proving an alleged constitutional

violation rests on the party asserting it. *Morey v Doud,* 354 US 457; 77 S Ct 1344; 1 L Ed 2d 1485 (1957).

Such an allegation must be sustained not as a matter of speculation but as a demonstrable reality. See *Beck v Washington,* 369 US 541; 82 S Ct 955; 8 L Ed 2d 98 (1962). Further, it is established that the potential for bias that would overturn an arbitration award must be certain and direct and not remote, uncertain or speculative. See, *North American Steel Corp v Siderius, Inc,* 75 Mich App 391, 404; 254 NW2d 899 (1977).

The right of access to the courts is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental rights. *Wolff v McDonnell,* 418 US 539; 94 S Ct 2963; 41 L Ed 2d 935 (1974).

Under the Due Process Clause of the United States Constitution, Am XIV, a person is entitled to have a hearing by an impartial and disinterested tribunal in both civil and criminal cases. *Marshall v Jerrico, Inc,* 446 US 238; 100 S Ct 1610; 64 L Ed 2d 182 (1980). In striking down a procedure where a mayor's salary was paid in part from fees levied by the mayor while acting in a judicial capacity, the court observed, a "procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused" is in conflict with the Due Process Clause. *Tumey v Ohio,* 273 US 510; 47 S Ct 437; 71 L Ed 749; 50 ALR 1243 (1927). In *Ward v Village of Monroeville,* 409 US 57; 93 S Ct 80; 34 L Ed 2d 267 (1972), it was held that, although the mayor was not

directly compensated from traffic fine revenues, a mayor was nonetheless barred from adjudicating traffic offenses where a clear nexus existed between traffic fine revenues and city finances in general. In so ruling, the Supreme Court stated that the mayor's executive responsibility for city finances presented too great a temptation to abuse his judicial power in punishing traffic offenders. Because of potential bias, the mayor was thus precluded from continuing as an adjudicator. Similarly, in *Gibson v Berryhill,* 411 US 564; 93 S Ct 1689; 36 L Ed 2d 488 (1973), a clear connection was shown between the fact finder's stature and his likelihood of bias. *Gibson* forbids a fact finder from sitting in a case where his business may be increased as a direct consequence of his decisions as fact finder. Fairness in the adjudicative procedure has been stated in verying ways. For instance "justice must satisfy the appearance of justice", *Offutt v United States,* 348 US 11; 75 S Ct 11; 99 L Ed 11 (1954). This striving for neutrality at times bars judges who have no actual bias and who would do their best to keep the scales of justice equally balanced. *In re Murchison,* 349 US 133, 136; 75 S Ct 623; 99 L Ed 942 (1955).

In Michigan, by far the most important case is *Crampton v Dep't of State,* 395 Mich 347; 235 NW2d 352 (1975). In that case, Crampton was arrested by a police officer from the Lansing Police Department. On appeal to the License Appeal Board, another Lansing police officer, representing the Chief of Police, sat on the License Appeal Board to determine issues related to the implied consent law. The Court held that such a panel was not a fair and impartial tribunal that could constitutionally be permitted to sit as adjudicators in a law enforcement dispute between a citizen and a

police officer. *Crampton* sets forth several criteria for evaluating the fitness of a fact finder to hear a case. The risk of actual bias is too great where the decisionmaker has a pecuniary interest in the outcome, or has been the target of personal abuse or criticism by the party before him, or was enmeshed in other matters involving the petitioner, or might prejudge the case because of prior participation as an investigator, fact finder or decisionmaker.

The reasoning of the *Crampton* Court is found on pages 357 and 358, where the Court states:

"We do not suggest that police officers and prosecutors are not fair-minded. But they are deeply and personally involved in the fight against law violators. As law enforcement officials they are identified and aligned with the state as the adversary of the citizen who is charged with violation of the law. Their function and frame of reference may be expected to make them 'partisan to maintain' their own authority and that of their fellow officers. The risk that they will be unable to step out of their roles as full-time law enforcement officials and into the role of unbiased decisionmaker in a law enforcement dispute between a citizen and a police officer presents a probability of unfairness too high to be constitutionally tolerable."

The procedure present in the *Tumey, Ward, Gibson* and *Crampton* cases by which a decisionmaker is selected differs substantially from the case before us. First, the arbitration provided herein is voluntary and is revocable. MCL 600.5041 subds (1)-(3); MSA 27A.5041 subds (1)-(3). Each party may have counsel and exercise the normal adversary rights extant in civil trials. MCL 600.5043; MSA 27A.5043. The arbitrators are selected from a pool governed both by statute, MCL 600.5044 subds (3)-(5); MSA 27A.5044 subds (3)-(5),

and by the American Arbitration Association,
MCL 600.5040(2)(a); MSA 27A.5040(2)(a). The par-
ties may choose their own arbitrators. MCL
600.5044(6); MSA 27A.5044(6).

The parties are afforded liberal rights of chal-
lenge. If the parties themselves cannot agree on a
panel, the association shall select the panel or a
member thereof. In addition the statute provides:

"The appointment by the association shall be subject
to challenge by any party for cause which challenge
may allege facts to establish that unusual community
or professional pressures will unreasonably influence
the objectivity of the panelist." (MCL 600.5044[5]; MSA
27A.5044[5]).

Additionally, two of the three arbitrators may
render an enforceable award. The plaintiff con-
tends that the presence of a physician provides an
advocate on the tribunal. Herein lies the crux of
the problem before us. Can a practicing physician
maintain neutrality as a decisionmaker? I am not
able to find any reasoning in *Crampton* which
would disqualify any and all physicians from sit-
ting as fact finders in medical arbitrations solely
because of occupation. Whether the system will be
workable remains to be seen.

Because submission to arbitration is a voluntary
decision and because of the safeguards provided in
the process whereby the arbitrators are selected,
the Michigan medical malpractice arbitration act
is not an unconstitutional denial of a malpractice
plaintiff's right to due process of law.

Affirmed.

J. H. GILLIS, J., concurs in the result reached by
CYNAR, J., for the reasons set forth in the opinion

of BASHARA, J., in *Brown v Siang*, 107 Mich App
91; 309 NW2d 575 (1981).

BRONSON, P.J. *(concurring in part and dissenting
in part).* On November 9, 1976, plaintiff signed an
arbitration agreement at the time of her admission
to defendant hospital for a hysterectomy. Defen-
dant doctor had an agreement with the hospital to
arbitrate all claims brought against the hospital or
himself by reason of the operation.

Following the hysterectomy, plaintiff developed
peritonitis. On July 19, 1977, plaintiff filed a com-
plaint in the Macomb County Circuit Court alleg-
ing negligence in the surgical procedure, causing
her to develop peritonitis, and negligence in failing
to promptly diagnose and treat the condition. De-
fendants moved for dismissal of the case, contend-
ing that the execution of the arbitration agree-
ment precluded filing suit in circuit court. Plaintiff
resisted the dismissal arguing that the medical
malpractice arbitration act, MCL 600.5040 *et seq.;*
MSA 27A.5040 *et seq.,* was constitutionally defec-
tive. On July 19, 1979, the trial court ordered the
matter submitted to arbitration and dismissed
plaintiff's complaint with prejudice. Plaintiff now
appeals as of right.

I

The first problem we confront is whether the
composition of the arbitration panel is constitu-
tionally defective on due process grounds. US
Const, Am XIV, Const 1963, art 1, § 17. MCL
600.5044(2); MSA 27A.5044(2) mandates a three-
member arbitration panel for medical malpractice
claims. One of these arbitrators must be a physi-
cian, preferably from the respondent's medical
specialty. Whether the presence of a doctor on the

arbitration panel is violative of due process has been considered in a number of cases before this state's circuit courts. The majority of these courts have held that the statute is constitutionally sound.[1] However, there is not unanimity on this score.[2]

As a general proposition, an individual's right to due process of law does not require a litigant to prove actual prejudice on the part of the tribunal. Instead, a tribunal which is composed in such a way that too great a risk exists that one or more of the judges *may* have a personal interest in the outcome of the proceedings, and thus be biased, is enough to render it constitutionally deficient on due process grounds. *Ward v Village of Monroeville,* 409 US 57, 59-61; 93 S Ct 80; 34 L Ed 2d 267 (1972), *Gibson v Berryhill,* 411 US 564, 578-579; 93 S Ct 1689; 36 L Ed 2d 488, 499-500 (1973), *Connally v Georgia,* 429 US 245, 249-250; 97 S Ct 546; 50 L Ed 2d 444, 447-448 (1977), *Crampton v Dep't of State,* 395 Mich 347, 355-356; 235 NW2d 352 (1975). The resolution of this issue, then, first requires us to ascertain whether the medical member of the panel has such an interest in the outcome of malpractice cases that there is too great a risk he will not be impartial. In *Ward, supra,* the Supreme Court stated that the test to apply was whether the situation of the decision-maker in question would offer a possible temptation to the average person as a judge to forget the required burden of proof or might make him devi-

---

[1] See, *e.g., Malek v Jayakar* (Wayne County, Civil Action No. 78-802-604-NM), *Yager v Locke* (Lenawee County, No. 79-07-627-NM), *Lorenz v Mendelsohn* (Oakland County, No. 79-187-555-NM), *Chaston v Stubbs* (Washtenaw County, No. 80-18636-NM), *Pipper v DiMusto* (Macomb County, No. 76-8188-NM).

[2] See, *Manuel v Pierce* (Wayne County, Civil Action No. 79-929209-NM), *Taylor v Detroit Bank & Trust Co* (Macomb County, No. 77-1906-NM).

ate from the required balance between the competing parties.

In *Ward,* an Ohio statute authorized the mayors of various jurisdictions to sit as judges in cases involving ordinance violations and certain traffic offenses. A substantial portion of the Village of Monroeville's total income was derived from revenues brought in by the mayor's court. Although there was no evidence that the mayor was actually unfair in how he handled these cases nor proof that the mayor's personal pecuniary status was enhanced by the fines he levied, the Supreme Court determined that "possible temptation" might exist since the mayor was responsible for village finances.

Defendants on appeal contend that any pecuniary interest on a doctor-arbitrator's part is too speculative and remote to support the conclusion that the composition of the panels offends due process. In *State ex rel Strykowski v Wilkie,* 81 Wis 2d 491, 515; 261 NW2d 434 (1978), the Wisconsin Supreme Court upheld the validity of medical screening panels which included two health care providers out of a tribunal of five.[3] The court said:

"The petitioners argue that panel members who are health care providers are financially interested in panel decisions because they, along with all other health care providers in the state, pay annual assessments to maintain the patients' compensation fund. However, any financial interest inherent in the structure of Chapter 655, Stats, is too remote and speculative to require disqualification. Absent evidence to the contrary, adju-

[3] At this point, I note that the Wisconsin system is unlike Michigan's. Rather than a system of binding arbitration, Wisconsin employs compulsory medical screening panels. Before suit may be instituted, the claim must first be submitted to a medical panel for review. Following this review, a plaintiff has a right to a trial *de novo* from a decision of the arbitration panel.

dicators must be presumed to be persons of honesty and integrity. See *Withrow v Larkin,* 421 US 35, 47; 95 S Ct 1456; 43 L Ed 2d 712 (1975).

"Petitioners' claim is not one of actual bias. There is no suggestion that any panel member bears them ill will or has a financial stake in their particular claims. It may be assumed that if such actual bias were alleged and demonstrated, panel members would be subject to the common-law duty of disqualification. See *Kachian v Optometry Examining Board, supra,* 44 Wis 2d at 12, 13; 170 NW2d 743. Because there is no indication of actual bias, and because the statutory procedure for the selection of the panel does not suggest a probability of systematic bias or prejudice, the requirements of due process are satisfied. *Cf., Naus v Jt SD No 1 Sheboygan Falls,* 76 Wis 2d 104, 114; 250 NW2d 725 (1977)."

*Strykowski* has been relied upon in nearly every circuit court opinion holding that the arbitration panels constitute fair and impartial tribunals without any real probability of potential bias.[4] Unlike this case, in *Strykowski* apparently no evidence tending to show a probability of bias caused by the physician-arbitrator's presence on the panel was introduced. In the instant matter, however, affidavits by Haig G. Neville and Duane LaMoreaux, both experienced underwriters of medical malpractice insurance since the 1950's, were made part of the record. Both men specifi-

---

[4] It should be noted that the Wisconsin Supreme Court in *Strykowski* split on a 4 to 3 vote. Two of the dissenting justices suggested that there may be a sufficient possibility of bias in the doctor panel members to offend due process. However, as "the dimensions of the financial interest were not set forth in the stipulation or briefs" the dissent was not specifically premised on due process grounds. *Id.,* 455-456. In *Parker v Children's Hospital of Philadelphia,* 483 Pa 106; 394 A2d 932 (1978), involving a screening panel system like Wisconsin's, which has also been extensively relied on by the circuit courts, one of the dissenting judges specifically relied on the due process claim made here in holding the act unconstitutional. *Id.,* 946. The Pennsylvania statute has since been declared unconstitutional on other grounds. *Mattos v Thompson,* 491 Pa 385; 421 A2d 190 (1980).

cally averred that any hospital administrator or physician would have a direct and substantial interest in the outcome of arbitrated cases insofar as any award rendered in plaintiff's favor would affect both the availability and cost of medical malpractice insurance.[5]

---

[5] Mr. Haig's affidavit stated in relevant part:

"5. That the 'rate jurisdiction' for hospitals and physicians is the State of Michigan regarding both the:

"(a) Availability of insurance; and

"(b) The amount of the premium paid therefor.

"In other words, all hospitals or physicians are placed in one category for purposes of medical malpractice insurance. Thus, *regardless* of the individual track record of a particular physician or hospital, the medical malpractice insurance rate with respect thereto is generally determined by the number of claims, settlements, and judgments against all other physicians or hospitals in this state. Any physician-arbitrator has a vested interest in the outcome of the arbitration proceeding in which he is sitting as a trier of fact."

Mr. LeMoreaux's affidavit provided in part:

"12. That based upon my experience and training, the inter-relationship that exists between reserves and trend factors is as follows: (a) as the claim size increases, the medical malpractice insurance carrier increases the size of its reserves on pending claims and such tends to increase the size of the reserves on future claims; (b) when the reserves are increased, rates are also increased; and (c) the individual effect of a single claim in the medical malpractice insurance area is direct and substantial given the relatively small number of claims and a relatively small number of insureds existing in the area of medical malpractice.

\* \* \*

"17. That based upon my experience and training, the effect of a particular claim made against a physician in a particular rate classification (specialty) would not only effect [sic] the physicians in that classification but each and every physician regardless of the specialty or classification within the State of Michigan.

"18. That based upon my experience and training, an arbitration award would have a universal effect upon each and every physician within the State of Michigan with respect to th [sic] cost of medical malpractice insurance and the availability thereof.

"19. That based upon my experience and training, although medical malpractice insurance rates reflect a number of factors, the major cost as reflected in the insurance rate is the amount paid to the claimant vis-à-vis a judgment or settlement.

"20. That based upon my experience and training, the physician arbitrator, whether or not in the same specialty or classification as the defendant physician, has an interest in the arbitration proceeding

I also consider the impetus behind enactment of Michigan's and our sister states' medical malpractice mediation or arbitration systems in reaching a decision on this issue. It is generally agreed among commentators on the subject that the late 60's and 70's have witnessed what has been termed a medical malpractice insurance crisis. This crisis has manifested itself in spiraling insurance costs to health care providers and an actual reduction in the number of companies offering medical malpractice insurance. Many doctors have found it difficult to obtain insurance at any price. The legislative response has been the adoption of various systems to reduce medical malpractice costs and insure the continuing availability of insurance.[6] The most popular type of system involves

if an award is rendered in favor of plaintiff insofar as such proceeding has a direct and substantial effect upon both the availability of medical malpractice insurance and the cost with respect thereto.

"21. That based upon my experience and training, given the non-medical job responsibilities of the hospital administrator, the hospital administrator has a built-in bias in the area of medical malpractice insurance, both as to the affordability and availability of such insurance.

"22. That based upon my experience and training, any award in an arbitration proceeding would have a direct and substantial effect upon the insurance rates of every hospital within the State of Michigan.

"23. That based upon my experience and training, a small number of physicians and a number of hospitals within the State of Michigan are self-insured.

"24. That based upon my experience and training, that the physician who is self-insured or the hospital that is self-insured establishes its own reserves and the amount of money that is set aside with respect thereto is directly related to the I.S.O. rating structure."

[6] Among others see, Sonbar & Potaki, *Arbitration and Screening Panels in Medical Malpractice,* 3 Okla City U L Rev 33 (1978), Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications,* 55 Tex L Rev 759 (1977), Abraham, *Medical Malpractice Reform: A Preliminary Analysis,* 36 Md L Rev 489 (1977), Comment, *Michigan's Medical Malpractice Legislation—Prognosis: Curable Defects,* 55 U of D J of Urban Law, p 309 (1978), Comment, *The Constitutional Considerations of Medical Malpractice Screening Panels,* 27 Am U L Rev 161 (1977), Comment, *Recent Medical Malpractice Legislation—A First Checkup,* 50 Tul L Rev 655 (1976), Note, *Medical Malpractice Mediation Panels: A Constitutional Analysis,* 46 Fordham L Rev 322 (1977).

the use of mandatory screening panels prior to institution of suit. All of these systems provide for panels which include at least one health care provider; in some systems all voting members are physicians. Following the screening, the plaintiff may seek a trial *de novo* if unsatisfied with the result rendered. The majority of states allow the decision of the screening panel to be admitted into evidence,[7] although this is not universally true.[8]

There can be no doubt that the mere enactment of legislation designed to reduce malpractice insurance costs and to insure its continuing availability does not, by itself, indicate that said legislation suffers from constitutional defects. Indeed, the goals to be achieved are admirable. At the same time, however, I cannot blind myself to the fact that such legislation is backed by and large by health-care professionals. It is obvious that physicians, themselves, believe they will fare better under systems where they have direct decision-making responsibilities in individual cases as opposed to the traditional jury system. Of course, this is not proof that the physician-arbitrator will be biased. Ostensibly, the purpose of including doctors on the panels is to insure that an arbitrator with medical expertise, unswayed by sympathy, is instrumental in passing on malpractice questions. However, I believe this goal could be achieved without resorting to the use of physicians as arbitrators. Any professional arbitrator is unlikely to be swayed by sympathy in reaching a decision on malpractice questions. Medical exper-

---

[7] *E.g.,* Ariz Rev Stat § 12-567 (Cum Supp 1976), Ind Code Ann §§ 16-9.5-9-1 to 9-10 (Burns Cum Supp 1976), Mass Ann Laws ch 231, § 60B (Michie/Law Co-op Cum Supp 1977), Wis Stat Ann §§ 655.02-21 (West Spec Pamphlet 1977).

[8] *E.g.,* Ark Stat Ann §§ 4-2601 to 2612 (Cum Supp 1975), Kan Stat 65-4901 to 4908 (Cum Supp 1976).

tise could be presented to an arbitration panel as it has traditionally been presented to juries, through expert testimony. The inclusion of health care professionals on the panel, then, seems at least in part to be intended to insure that doctors have an advocate on the tribunal.

In addition, relatively recent cases and articles have commented on the unwillingness among medical practitioners to testify against one another. See, *e.g., Morgan v Rosenberg,* 370 SW2d 685 (Mo App, 1963), *Halldin v Peterson,* 39 Wis 2d 668; 159 NW2d 738 (1968), *L'Orange v Medical Protective Co,* 394 F2d 57 (Ca 6, 1968), *Agnew v Parks,* 172 Cal App 2d 756; 343 P2d 118 (1959) (suit was brought against a group of doctors for "conspiracy to obstruct the ends of justice" for their refusal to testify), Markus, *Conspiracy of Silence,* 14 Cleveland-Marshall L Rev 520 (1965), *Seidelson, Medical Malpractice Cases and the Reluctant Expert,* 16 Cath U L Rev 158 (1966),[9] Problems with the "conspiracy of silence" have been mitigated over the years. Nonetheless, it is not unrealistic to conclude that anti-plaintiff attitudes continue to exist among large numbers of doctors.[10] As such, there is a strong possibility that the physician on an arbitration panel will be biased.

[9] In Prosser, Torts (4th ed), § 227, fn 3, the author notes a survey conducted by the Boston University Law-Medicine Research Institute and reported in Medical Economics on August 28, 1961. The survey showed that out of 214 doctors, only 31% of the specialists and 27% of the general practitioners would be willing to testify for the plaintiff if a surgeon, operating on a diseased kidney, removed the wrong one.

[10] There is a medical community whose members face in their daily efforts to make a living common experiences and risks, including: (1) the possibility of being subjected to a suit for malpractice; (2) inconvenience associated with the defense of such a suit; (3) anxiety associated with a malpractice suit; (4) subjection to increased malpractice costs; and (5) facing the possibility that malpractice insurance cannot be obtained at any cost. It would be the uncommon physician who did not have a bias, either overtly or unconsciously, against a plaintiff alleging medical malpractice.

With reference to representatives of the Attorney General and the local police department sitting on the tribunal whose responsibility it was to determine if a person's driver's license should be revoked, the Michigan Supreme Court in *Crampton, supra,* held:

"We do not suggest that police officers and prosecutors are not fair-minded. But they are deeply and personally involved in the fight against law violators. As law enforcement officials they are identified and aligned with the state as the adversary of the citizen who is charged with violation of the law. Their function and frame of reference may be expected to make them 'partisan to maintain' their own authority and that of their fellow officers. The risk that they will be unable to step out of their roles as full-time law enforcement officials and into the role of unbiased decisionmaker in a law enforcement dispute between a citizen and a police officer presents a probability of unfairness too high to be constitutionally tolerable." *Id.,* 357-358. (Footnotes omitted.)

Similarly, I do not suggest that doctors are not generally fair-minded. However, arbitrators who are members of the medical community are identified and aligned with the physician or hospital as the adversary of the malpractice claimant. Their "function and frame of reference" may be expected to make them partisans of their professional colleagues.[11]

---

[11] It has been suggested that there is no essential difference between a medical arbitration board and the grievance procedure used by the State Bar where all decisionmakers are attorneys. I disagree. The grievance boards decide if disciplinary action should be taken against individual lawyers, they do not adjudicate claims of professional malpractice. There is no reason to believe the attorneys on the board are desirous of disciplining fellow practitioners and are biased against them. If a statute similar to the medical malpractice arbitration act was enacted in reference to claims of legal malpractice, the same due process problems would exist.

The fact that there is a high probability of bias caused by the composition of the arbitration boards is insufficient to declare this aspect of the legislation unconstitutional. There must also be a finding of state action. Some of the lower court opinions have held that the arbitration system relies solely on private contracts, without semblance of state action. I disagree. MCL 500.3053(1); MSA 24.13053(1) provides:

"As a condition of doing business in this state a malpractice insurer shall not offer a policy of professional liability insurance to any hospital unless the policy contains a provision in the form and upon such other conditions as the commissioner shall approve, which requires the insured to offer a form of arbitration agreement to each patient treated or admitted."

Professional liability insurance is a virtual necessity so that this provision compels hospital-based physicians to offer to arbitrate disputes with their patients.

Moreover, the state has mandated the form the agreement to arbitrate must take, MCL 600.5041; MSA 27A.5041, how the costs of the arbitration will be shared between the parties, how the arbitrators will be selected, and the composition of the arbitration panel. MCL 600.5044; MSA 27A.5044. In actuality, the parties do not privately determine how the arbitration is to work. State action is pervasive in the area of medical malpractice insurance and arbitration. Cf., *Shavers v Attorney General,* 402 Mich 554; 267 NW2d 72 (1978).

Defendants' most persuasive argument for upholding Michigan's arbitration system is that the parties voluntarily entered into the agreement to arbitrate. I start from the premise that for the waiver of a constitutional right to be effective,

there must be an intentional relinquishment or abandonment of a known right. *Johnson v Zerbst,* 304 US 458, 464; 58 S Ct 1019; 82 L Ed 1461 (1938), *People v Jaworski,* 387 Mich 21, 30; 194 NW2d 868 (1972), *People v Grimmett,* 388 Mich 590, 598; 202 NW2d 278 (1972), *People v Lucas,* 47 Mich App 385, 388-389; 209 NW2d 436 (1973), *People v Kitley,* 59 Mich App 71, 75; 228 NW2d 834 (1975), *People v Brewer,* 88 Mich App 756, 760; 279 NW2d 307 (1979), *lv den* 407 Mich 856 (1979). Although I fail to find any Michigan civil cases involving effective waiver of a constitutional right, there is no reason to treat fundamental constitutional rights differently solely because they arise in the civil context. The Michigan Supreme Court has applied the "intentional relinquishment or abandonment of a known right" standard in civil cases where the issue did not concern a constitutional claim, *Welling v Dave's Cut Rate Drugs, Inc,* 362 Mich 389; 107 NW2d 798 (1961), *Book Furniture Co v Chance,* 352 Mich 521; 90 NW2d 651 (1958), *a fortiori,* this standard must be applied where a constitutional right is involved in a civil matter.

The "arbitration agreement" (see attached Appendix A) mandated for use by the state says nothing about the composition of the arbitration panel. It is a probability that a patient agreeing to arbitrate will not understand that the panel includes a physician as one of its members. Defendants attempt to counter this argument by noting that a patient information booklet, which must be given to all individuals who agree to arbitrate, explains how the panel is composed. However, the face of the agreement, itself, provides:

"I certify that I have read this agreement or have had it read to me and that I fully understand its

content and execute this agreement of my own free will. I have received a complete copy of the booklet which explains this agreement."

Assuming *arguendo*[12] that the patient actually does understand the arbitration agreement, the agreement, itself, does not require that the patient has actually read and understood the information booklet. Rather, all the patient acknowledges by his or her signature on the form is receipt of the booklet. A near simultaneous handing of the booklet and signing of the form is all that is required to constitute a waiver under the statutory scheme.

Defendants, however, contend that even in this situation there are adequate safeguards because the information booklet describes the panel composition, and patients have 60 days from the time of execution to revoke their consent. These facts certainly show some legislative concern for patient rights, but they do nothing to guarantee a knowing waiver in the first instance.[13] It cannot be presumed that the patient will later read the information booklet. Moreover, even if the patient does read the booklet, that malpractice has occurred is frequently not apparent 60 days after the

---

[12] The self-serving language of the form which provides "I have read this agreement or had it read to me" is not binding on this Court. There is nothing in the statute which insures that illiterates and those with reading difficulties will be identified by hospital personnel. Thus, unless this information is volunteered, such a person might well sign the form and understand nothing about what it means.

[13] An analogy to a criminal proceeding reveals the weakness of this argument. Suppose the Legislature passed a statute requiring that every criminal defendant be presented with a form asking him to waive his right to a jury trial. Suppose this statute also provided that every defendant signing the form would be tried by an arbitration panel. However, the form did not explain that one of the arbitrators must be a police officer, which the statute requires. Obviously, such a scheme would be summarily stricken down by the courts even if the defendant was given some time to revoke his consent after execution.

time he or she has executed the agreement.[14] It
cannot be presumed that a patient who reads the
booklet will make the effort to revoke the agree-
ment where no apparent problems have arisen.
Finally, even if the patient reads the booklet, it
does not explain that the medical member of the
panel will preferably come from within the defen-
dant's specialty, where the community of interest
is likely to be strongest.

Up to this point I have dealt only with those
individuals who actually can read and understand
English well enough to comprehend what has been
written. In Comment, *Michigan's Medical Malprac-
tice Legislation—Prognosis: Curable Defects,* 55 U
of D J of Urban Law, pp 310, 326-327 (1978), the
author notes that the patient information booklet
and the arbitration agreement forms were pre-

---

[14] While this issue was not raised in the instant case, the 60-day
revocation period is an onerous and unreasonable burden which
presents due process questions, itself. The 60-day revocation period is
found in the arbitration agreements both with "hospitals" and
"health care providers". MCL 600.5041(5); MSA 27A.5041(5), which
pertains to agreements with "health care providers", gives those who
agree to arbitrate 60 days from the *execution* of the agreement the
right to revoke. If the agreement is not revoked its life is one year,
MCL 600.5041(4); MSA 27A.5041(4). Thus, it is possible under the
statute for a person to have lost the right to bring an action for
malpractice before the right even accrued. Since increasingly greater
numbers of surgical procedures are not conducted in hospitals, the
ramifications of this provision are immense. Where surgery is not
required immediately, non-hospital based doctors could get the agree-
ment to arbitrate executed during an initial visit and then schedule
the surgery 61 or 62 days later, thereby insuring that the patient
must arbitrate if malpractice is later alleged to have occurred. This
problem does not exist in relation to MCL 600.5042(3); MSA
27A.5042(3). Nonetheless it is likely that patients will lose the right to
revoke the agreement before they discover the malpractice. Besides
being questionable on due process grounds, the differing revocation
provisions may also present an equal protection problem since they
create one class of patients who may waive their right to institute a
court action before the treatment has occurred and one class of
patients who have at least 60 days to consider the results of the
treatment before deciding whether to revoke. It is questionable
whether a rational basis exists for the disparate treatment of these
two groups.

pared largely by professionals and that there is no valid reason to assume that patients should comprehend the complicated legal concepts contained therein. See, also, *Wheeler v St Joseph Hospital,* 63 Cal App 3d 345; 133 Cal Rptr 775, 786 (1976), Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice,* 58 Va L Rev 947, 986 (1972).

It is urged by defendants that problems with comprehension on the parts of individual patients merely present potential contractual defenses and should be treated as such. I disagree because as the state-fostered arbitration system is currently structured it is inherently unlikely that any individual who agrees to arbitrate will understand the due process implications of this decision. The portion of the statute relating to the composition of the arbitration panels violates due process of law by forcing the litigant to submit his or her claim to a tribunal which is composed in such a way that a high probability exists that said tribunal will be biased against the claimant without mandating the use of an arbitration form explicitly detailing the nature of the panel's makeup.[15] Since I am not convinced that the Legislature would have enacted the Medical Malpractice Arbitration Act without providing for a physician on the arbitration panels, I cannot sever MCL 600.5044(2); MSA 27A.5044(2) from the rest of the act and uphold the remaining provisions. Consequently, I hold

[15] I do not mean to imply that no statutory scheme could be devised which is not unconstitutional. However, at a minimum such a system would have to detail how the panel was composed. The Legislature would also be well advised to require that an arbitration agreement be read to the patient. I do not contend that a statute which does not provide for an oral review of the agreement would necessarily be unconstitutional. However, even if held to be constitutional, such a system would be susceptible to attack based solely on contractual grounds in individual cases.

that the act is unconstitutional for failure to provide for a facially fair tribunal.

## II

Plaintiff also contends that the medical malpractice arbitration act is unconstitutional or unconscionable as it deprives the patient of a meaningful opportunity to decide whether to relinquish his or her constitutional right to "court access". As to the constitutional aspect of the claim, I reject it out of hand. The arbitration form clearly informs the patient that arbitration is a substitute for a trial by judge or jury. While it is true that the form does not explain the truncated appellate rights a plaintiff agreeing to arbitrate possesses,[16] due process does not require appellate review at all. *Moore v Spangler,* 401 Mich 360, 368-369; 258 NW2d 34 (1977). Although the Michigan Constitution gives criminal defendants a right to appeal, Const 1963, art 1, § 20, no comparable right is extended to civil litigants.[17]

---

[16] GCR 1963, 769.9 specifies on what grounds an arbitration award may be vacated and provides in relevant part:

"(1) Upon application of a party, the court shall vacate an award where:

"(a) The award was procured by corruption, fraud or other undue means;

"(b) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

"(c) The arbitrators exceeded their powers; or

"(d) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing as to prejudice substantially the rights of a party."

[17] Once again, however, the failure to advise a patient of the nature of his appellate rights should he choose to arbitrate may be a defense in an action to compel litigation. This unknown and undisclosed term might be held to exceed the "range of reasonable expectation" a patient would have in executing the agreement. See, Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice, supra.*

The claim of unconscionability is more troubling. In the typical case not involving emergency treatment, the patient is asked to agree to arbitrate any claim arising out of the care he is provided. It may well be that the patient knows execution of the agreement is not a prerequisite to health care. However, a coercive atmosphere is created by the timing of the presentation of the agreement and by the circumstances the patient finds himself under while in the hospital. It is probable that many patients believe they will receive better care or at least be treated better by hospital staff if they execute the agreement.

Additionally, the patient's need for medical care may well render him unable to truly appreciate the nature of arbitration. The patient may be preoccupied and willing to sign anything handed to him. Professor Henderson states in *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice, supra,* 987:

"Given the distinctive nature of the medical services transaction, the use of a standardized form runs the risk of failing to satisfy the policy of awareness. The arbitration provision, viewed from the perspective of the patient, is indeed subsidiary to the primary exchange of medical services for an undertaking of payment. After consenting to medical procedures, the contract purchaser of medical services may fairly assume that no obgliations other than that of payment are imposed. Absent some guidance by the medical entity, the patient has little reason to know anything at all about arbitration, let alone that the tendered document requires it. Nor should the medical entity ordinarily expect a patient to read or even to understand a broad arbitration clause. In these circumstances a court is faced with the question of whether the patient is nevertheless bound by the term since he knew that the writing was used to embody contract terms. In resolving that question, a consideration peculiar to all executory

arbitration agreements may well be weighted heavily in the medical context. Not only is the resisting party (presumably the patient) claiming lack of knowledge of the arbitration term, but he asks not to be prevented from litigating a consequential loss controversy that was also unknown and non-existent at the time of contracting. Viewed in this light, the knowledge factor is doubled in its impact." (Footnotes omitted.)

Between July 1, 1969, and the beginning of 1970, an arbitration project in southern California, involving eight hospitals, sought to collect statistical data about the cost effectiveness of arbitration compared to trial. Of the more than 500,000 patients admitted into participating hospitals, only 1,800 refused to sign arbitration agreements. Nonetheless, large numbers of patients later contested the legality of their agreements by instituting malpractice suits. Heintz, *Arbitration of Medical Malpractice Claims: Is It Cost Effective?*, 36 Md L Rev 533, 537-538 (1977). To me, this suggests that many patients really do not feel free to refuse to sign the agreements. It is difficult for me to believe that patients actually made an informed choice, without compulsion, where less than one half of one percent of the total chose not to execute an arbitration agreement.

I think offering the patient the opportunity to execute the arbitration agreement prior to admission or while in the hospital during treatment represents bad policy. However, policy-making is a legislative prerogative. The Michigan Legislature by enactment of the Medical Malpractice Arbitration Act has affirmatively endorsed practices I believe are objectionable. Except as noted in part I, *supra,* however, I do not find the statute constitutionally deficient and, since a declaration of unconscionability manifestly involves policy deter-

minations, in light of the affirmative legislative acts, I am unwilling to void the statute on this basis.

## III

I reject plaintiff's contention that the arbitration agreement represents a contract of adhesion. A contract of adhesion is one in which the consumer must accept the agreement presented in order to avail himself of the goods or services desired. The consumer really has no opportunity to bargain over terms. The significant feature of a contract of adhesion is the weaker party has no influence over its terms. *Wheeler, supra,* 783. Although the patient's situation and the coercive atmosphere inherent in the hospital setting apparently makes it difficult to refuse to sign the arbitration agreement, the patient is not required to sign the same as a condition of admission or treatment. As such, the arbitration agreement is not a contract of adhesion.

I would reverse and remand for trial.

APPENDIX A

This form is approved by the Michigan
Commissioner of Insurance

ARBITRATION AGREEMENT

PHYSICIAN-PATIENT OUT-PATIENT FORM

I understand that my physician(s) and I by

signing this document agree to arbitrate any claims or disputes (except for disputes over charges for services rendered) which may arise in the future out of or in connection with my medical care.

I understand that Michigan Law gives me the choice of trial by judge or jury or of arbitration. I understand that arbitration is a procedure by which a panel that is either mutually agreed upon or appointed decides the dispute rather than a judge or jury. I freely choose arbitration, and I agree that a judgment of any circuit court may be rendered upon any award or determination made pursuant to this agreement. I also understand that any arbitration will be conducted in accordance with Michigan Law and the Michigan Medical Arbitration Rules, as approved by the Commissioner of Insurance.

I understand that this agreement to arbitrate is binding on me and all my agents, representatives and heirs and assigns, as well as on my physician(s). I also understand that if my physician(s) act(s) as an employee of a Professional Corporation or as an employee or member of a partnership when providing my medical care, the Professional Corporation or partnership is also bound by this agreement.

This agreement shall apply to any future claims or disputes arising out of or in connection with medical care received over a period of one year from this date.

I certify that I have read this agreement or have had it read to me and that I fully understand its content and execute this agreement of my own free will. I have received a complete copy of the booklet which explains this agreement.

THIS AGREEMENT TO ARBITRATE IS NOT A PREREQUISITE
TO HEALTH CARE OR TREATMENT, AND MAY BE REVOKED
WITHIN 60 DAYS AFTER EXECUTION BY NOTIFICATION IN
WRITING
TO: _____

_____          _____
Physician Name (Type or Print)   Patient Name (Type or Print)

_____          _____
Physician Signature              Patient Signature

_____          _____
Name of Professional Corpor-     Patient Address
ation or partnership, if any

_____          (I certify that I am the parent
Address                          of the minor child, the guardian
                                 or other legal representative
                                 of the patient involved.)
_____
Date

                                 _____
                                 Name of parent, legal guardian
                                 or other legal representative
                                 (type or print)

FOR FURTHER INFORMATION CONTACT: AMERICAN ARBITRATION
                        ASSOCIATION
City National Bank Building - No. 1035 - Detroit, Michigan 48226 -
                    Phone: (800) 482-0660